STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
CARL M. SCHMELZ, DEFENDANT-APPELLANT.

Argued December 13, 20, 1954—Decided January 17, 1955.

*Mr. Frank S. Katzenbach III* argued the cause for the appellant (*Messrs. Katzenbach & Salvatore,* attorneys).

*Mr. Frank H. Lawton,* Assistant Prosecutor, argued the cause for the State (*Mr. Mario H. Volpe,* Mercer County Prosecutor).

The opinion of the court was delivered by

VANDERBILT, C. J. On May 19, 1953, the Hamilton Township police in conjunction with detectives from the Mercer County Prosecutor's office conducted a raid on the

defendant's workshop located to the rear of his home. They proceeded to the second floor and broke into a small room where they discovered a short wave radio and various papers and paraphernalia that strongly indicated that bookmaking activities were being carried on there. While the police were searching the room the telephone rang several times, and each time the police answered it the caller attempted to place bets on horse races. Julius Erdie was arrested in the room and has since been convicted of bookmaking.

While the raid was in progress the defendant arrived on the scene and when questioned by the police denied knowledge of any bookmaking activities. The police took him to their headquarters, booked him for investigation and shortly thereafter filed a complaint against him for permitting a lottery on the premises. The defendant voluntarily signed a statement in which he said that some five months before Erdie had approached him and offered $35 a month to rent the second-floor room as an office in his business as a general contractor. An agreement was reached and shortly thereafter either Erdie or a man identified by the defendant as "the Count" would frequent the room daily, arriving around noon each day and then leaving in the evening. In his statement the defendant gave a detailed description of "the Count":

"I'd say he's a man about 5′ 7″ tall, weighs approximately 145 to 150 pounds, has a pencil mustache that runs across the middle of his upper lip, I'd say he's a man aged in the middle fifties, I'm not sure, his complexion is on the tan side, I never saw him without a hat, he never wore glasses, I never seen him with glasses, he was very clean shaven, I'd say his beard would be on the dark side, he was always in sporty clothes, sport shoes, sport slacks, sport coat, sport hat, whatever kind of hat he had, sometimes a tan jacket, different colored slacks, he had blue slacks, a gray sport coat and he had shoes to match, mostly a sport shirt, with no tie. He was gray on the temples. I don't know whether he was gray headed, dark headed or not. I'd say he was medium built. He's on the nervous side, too. The only time I ever saw him smoking was once he was smoking a cigar."

From a group of ten photographs he selected two pictures of "the Count" and one of Erdie, identifying them as the two men conducting the activity in the second floor room.

"The Count," whose real name was Albert Matalena, was picked up by the police and charged with bookmaking. He asked for a preliminary hearing, which was held in the Hamilton Township Municipal Court. At this hearing the State relied heavily on the defendant's testimony, assuming that he would testify to the facts set forth in the statement he had signed at police headquarters. Instead, at the hearing on June 4, 1953 the defendant testified under oath before the magistrate that he had never seen Matalena at his workshop and did not know him. At the continued date of the hearing on June 9, 1953 the defendant upon being confronted by Matalena testified, "I have never seen him."

The Mercer County grand jury handed down an indictment in four counts, counts one and two charging the defendant with perjury and false swearing respectively at the hearing on June 4, 1953, and counts three and four charging perjury and false swearing respectively at the hearing on June 9, 1953. At the conclusion of the State's case the trial court dismissed counts one and three for perjury on the ground that the State had failed to prove all of the necessary elements of that crime. The remaining two counts for false swearing were submitted to the jury, which found the defendant "guilty on both charges." On May 21, 1954 the court sentenced the defendant to the New Jersey State Prison for a term of not more than three nor less than two years and imposed a fine of $1,500. On July 6, 1954 the trial court reconsidered its sentence and reduced the fine to $1,000, but did not alter the prison sentence. The defendant's appeal from the judgment of conviction was certified by us on our own motion while pending in the Appellate Division.

(1) The State moves to dismiss the appeal for want of prosecution under R. R. 1:4–2(a) and (b) because of the defendant's failure to file and serve his brief and appendix within the period set forth in the rules of court. Although we might well dispose of this appeal on that ground, we will discuss the various points raised here, none of which requires a reversal of the judgment below.

(2) After the jury returned to the courtroom the foreman announced that they found the defendant guilty on both charges. The judge ordered the clerk to poll the jury and he did so in the approved manner, requiring each juror to answer "yes" or "no" as to whether his or her verdict was that announced by the foreman, *State v. Myers*, 7 *N. J.* 465, 483 (1951); *State v. Vaszorich*, 13 *N. J.* 99, 129 (1953), *certiorari* denied 346 *U. S.* 900, 74 *S. Ct.* 219, 98 *L. Ed.* 400 (1953). Eleven of the jurors answered in the affirmative, but upon the poll of Mr. Timm, juror No. 4, the following took place:

"Mr. Frome: George C. Timm, the verdict as announced by your Foreman is as follows: We find the defendant guilty as charged. Is that your verdict? Answer yes or no.

Mr. Timm: Sir, your Honor please, the Court, may I ask a question as I see fit or answer yes or no?

The Court: The question is very clear and simple, Mr. Timm, and you will have to answer it directly in response to the Clerk's question.

Mr. Timm: *Yes.*

Mr. Katzenbach: Your Honor please, I take an objection.

The Court: Just a moment. Mr. Timm, may I ask one question of you and please answer me very directly. Was there some explanation that you wanted to make as to your finding of your verdict?

Mr. Timm: So far as the verdict is concerned—

The Court: Please answer me directly and you may answer yes or no. Was there an explanation which you wanted to make?

Mr. Timm: I would call it so, sir, your Honor.

The Court: Record the answer as yes." (Italics supplied.)

The defendant argues that the court should have permitted further interrogation of this juror to determine whether he did concur in the verdict.

 In New Jersey it is well settled that the accused has an absolute right to have the jury polled, *State v. Vaszorich, supra,* 13 *N. J.* 99, 126 (1953), *R. R.* 3:7–9(*d*). The primary purpose of the poll is to determine whether there is a unanimous concurrence of the jury in the verdict rendered by the foreman, *State v. Vaszorich, supra,* 13 *N. J.* 99, 126, *R. R.* 3:7–9(*d*). "The practice of long standing requires each juror to answer for himself, thus creating individual responsibility, eliminating any uncertainty as to the verdict

as announced by the foreman," *State v. Cleveland,* 6 *N. J.* 316, 322 (1951). "The very purpose of the formality of polling is to afford an opportunity for free expression, unhampered by the fears or the errors which may have attended the private proceedings," 8 *Wigmore on Evidence* (1940 *ed.*), *sec.* 2355. And "if, upon the poll, there is not unanimous concurrence" in the verdict rendered by the foreman, "the jury may be directed to retire for further deliberations or may be discharged," *R. R.* 3:7-9 (*d*).

 Here the trial judge quite obviously was satisfied that juror No. 4 concurred in the verdict given by the foreman, and therefore he decided that there was no reason to return the jury for further deliberation or to discharge it. This decision was in keeping with well established authority that if it clearly appears that the juror concurs in the verdict any evasive statement or explanation volunteered by him is to be disregarded. In *McAlpine v. State,* 117 *Ala.* 93, 23 *So.* 130 (*Sup. Ct.* 1898), on the poll of the jury one juror in answer to the question "Is this your verdict?" replied "I submitted to it." The court then asked, "Mr. Beavers, did you acquiesce in this verdict and agree to it?" To which he replied, "I did." On appeal the defendant claimed that it was error to have entered a judgment upon such a verdict, but the Supreme Court of Alabama disposed of this argument, saying:

"There is nothing in the point raised against the verdict. The juror in reply to the question propounded by the court answered that he acquiesced in and agreed to the verdict. That was sufficient to show that it was his verdict." (at 23 *So.* at *page* 132)

In *Rudder v. State,* 12 *Ala. App.* 72, 67 *So.* 738 (*Ct. App.* 1915), upon the poll of the jury a juror agreed to the verdict but said that it was not what he wanted, as he did not approve of such a severe penalty. The court held that the verdict should stand because the juror agreed and acquiesced in it, and that the additional statement merely indicated that he preferred a lighter sentence. The court stated that "even though a juror at first answers evasively, if he finally acquiesces in and agrees to it, this is sufficient to show that it is

his verdict." In *State v. Millroy*, 103 *Wash*. 193, 174 *P*. 10, 12 (*Sup. Ct.* 1918), on the poll of the jury one juror in answer to the question. whether the verdict was his, had replied, "either that, or a hung jury." When admonished by the court to answer "yes" or "no," the juror answered "yes." On appeal the Supreme Court of Washington held that "the answer of the juror to the question of the court was conclusive, and the juror cannot now be heard to say that she did not agree to the verdict." This case was later cited with approval on this very point in *Vogt v. Curtis*, 200 *Wash*. 692, 94 *P*. 2d 761 (*Sup. Ct.* 1939) :

"It appears that the juror referred to in the opinion, when admonished by the court that she should answer the question directly, stated that the verdict was her verdict and the verdict of the jury. In view of her positive answer, her preliminary remark was unimportant. It was properly held that her answer was conclusive upon her, and that she could not thereafter impeach her solemn statement made upon the poll of the jury." (at 94 *P*. 2d at *page* 763.)

In *State ex rel. Neill v. Nutter*, 99 *W. Va*. 146, 128 *S. E*. 142 (*Sup. Ct. App.* 1925), the jury returned a verdict in favor of the defendant. Upon the poll 11 jurors answered yes and one juror answered no. In explanation of his negative answer juror Carpenter made the following statement to the court:

" 'It wasn't exactly my verdict, and before I left the room I told them if—you said to get a compromise. You said yesterday to give or take. It wasn't exactly my verdict the way I saw it, but to get a compromise, to come to a verdict, I said I would do that, providing I wasn't asked in court. I made that plain to the foreman of this jury, that if I was questioned on the matter, I would make it plain. It wasn't exactly my verdict.' "

Two other jurors stated that they held the same views as Carpenter. The court then returned the jury for further deliberations. When the jury returned to the courtroom Carpenter again made an explanation of his stand, saying :

" 'This was a proposal of my own, in order to get this jury together. This was my proposal to do that, with the understanding that if you polled us—if you all noticed, I sat there when you said if that was

our verdict. I didn't say "Yes" or "No," but when.it come to an explanation, I could make it.' "

He then further explained as follows:

" 'It is my verdict on a compromise. * * * I said that, to get the jury together, but not my real opinion.' "

Carpenter then told the court that the verdict of the jury represented his verdict "now." One of the other jurors signified that it was his verdict "on a compromise." After causing the jury to return the next day the trial judge refused to receive their verdict and discharged them. The defendant then obtained an alternative writ of *mandamus* requiring the judge to accept and record the verdict, or to show cause why he should not do so. The Supreme Court of Appeals awarded a peremptory writ of *mandamus*, saying:

"The court holds that the statement of each reluctant juror upon the second return of the jury into court, that the verdict was then his verdict on a compromise, made the verdict unanimous, and gave to it such finality that the trial court should then and there have received and recorded it. * ⁎ *" (at 128 *S. E.* at *page* 143)

See *McCoy v. Jordan,* 184 *Mass.* 575, 69 *N. E.* 358 (*Sup. Jud. Ct.* 1904), 8 *Wigmore, supra, secs.* 2349, 2355.

The defendant cites *Solar v. United States,* 86 *A. 2d* 538 (*Mun. Ct. App. D. C.* 1952). But there upon the poll of the jury, after the foreman had announced the verdict of guilty, the following took place:

" 'The Court: Very well. Answer as your name is called, guilty or not guilty—as your name is called.

One woman juror stated: May I know the reason for this? You see, I'm sorry, but what do you mean? Is what I did, the question?

The Court: Have you not decided whether or not this man is guilty or innocent?

The Woman Juror: I said not guilty. I said not guilty and I changed it to guilty in a way. Is that what you mean?

The Court: No; that is not what I mean. You went in the jury room and when you decided this issue, did you decide this man was guilty or not guilty?

The Juror: Guilty, I suppose.' " (at *pages* 539–540.)

The court entered a judgment of guilty which was reversed on appeal because of the doubt as to whether this particular juror concurred in the verdict delivered by the foreman. That case represents a clear instance of confusion on the part of the juror and certainly it was not clear as to how she had voted. That situation is a far cry from the case at bar. Here juror No. 4 indicated to the judge that he wished to ask a question. Then in reply to the judge's instruction to answer the question as to whether the verdict of guilty rendered by the foreman represented his verdict the juror gave an unequivocal "yes." Then he admitted to the court that his question had to do with an "explanation" as to the finding of his verdict. We therefore have a situation where the juror has replied affirmatively to the question, and in addition has admitted that the particular question which he wished to address to the court concerned merely an explanation concerning a decision which he had already reached. There was then a concurrence on his part in the verdict announced by the foreman.

The trial court having determined, and rightly so, that the particular juror in question had concurred in the general verdict, the purpose of the poll had been fulfilled and there was no reason for the court to examine him further, *Bruce v. Chestnut Farms-Chevy Chase Dairy,* 75 *U. S. App. D. C.* 192, 126 *F. 2d* 224, 225 (*C. A. D. C.* 1942); *Taylor v. Taylor,* 195 *Ga.* 711, 25 *S. E. 2d* 506, 512 (*Sup. Ct.* 1943); *Flournoy v. Brown,* 200 *Miss.* 171, 26 *So. 2d* 351, 355 (*Sup. Ct.* 1946); 8 *Wigmore, supra, sec.* 2355.

If, however, on the poll it had appeared that as a result of the juror's response in the negative to the question propounded by the clerk the trial court was in doubt whether the juror actually had concurred in the verdict announced by the foreman, the court might have interrogated the juror further in an effort to determine what his vote on the verdict really was. As a result of such interrogation the trial court might have exercised its sound judgment in determining what steps were then to be taken—that is, whether the verdict should be recorded because it appeared that actually the juror did concur in it, or whether because of a lack of concurrence

the jury should be discharged or returned for further deliberations, *R. R.* 3:7–9(*d*). Such questioning is in effect a part of the poll and is to be conducted by the court alone and solely for the limited purpose herein stated; see *Jackson v. State,* 147 *Ala.* 699, 41 *So.* 178, 179 (*Sup. Ct.* 1906); *Bruce v. Chestnut Farms-Chevy Chase Dairy, supra,* 75 *U. S. App. D. C.* 192, 126 *F.* 2d 224, 225; *Taylor v. Taylor, supra,* 195 *Ga.* 711, 25 *S. E.* 2d 506; *England v. State, Tenn.,* 264 *S. W.* 2d 815, 818 (*Sup. Ct.* 1954), 23 *C. J. S., Criminal Law,* § 1392.

■■ (3) The defendant next contends that the trial court committed prejudicial error in permitting the prosecution to lead the witness Ritter. The defendant fails to set forth any specific leading questions and he makes no reference in the appendix to where any such questions can be found. It is not the duty of an appellate court to search the record to discover errors by the trial court, but rather it is the function of counsel to set forth specifically the judicial action complained of, *State v. Cooper,* 10 *N. J.* 532, 563, 564 (1952); *State v. Janiec,* 11 *N. J.* 397, 399 (1953); *R. R.* 1:5–1, *R. R.* 1:7–1. On this point there is therefore no reviewable issue before us. We have, however, considered the matter on the merits in the form presented to us at the oral argument and we find it to be without substance.

■ (4) The defendant also labels as error the ruling of the trial court permitting Ritter to refresh his recollection. This witness for the State testified that while employed by the defendant he had often seen "the Count" at the defendant's workshop in such circumstances that the jury could reasonably infer that the defendant was acquainted with him. On examination Ritter was obviously confused as to the dates when he had worked for the defendant and had seen "the Count" on the premises. During a recess period he telephoned two of his former employers to learn when he had worked for them. Upon returning to the witness stand he testified that as a result of these telephone conversations his memory had been refreshed as to the dates he had worked for these persons, enabling him to fix the time when he had

been employed by the defendant and had seen "the Count" on the premises. Upon interrogation he stated unequivocally that he was testifying from his own recollection resulting from having refreshed his memory. Objection was made to the manner in which the witness had refreshed his memory. Regardless of the merits of the method of refreshing his memory, the defendant was not prejudiced because counsel for the defendant conceded at the oral argument that the dates given by Ritter in his testimony were in fact correct and manifestly the defendant cannot be prejudiced by the truth.

(5) The defendant next insists that there was insufficient evidence to support the verdict. In view of his failure to include all of the pertinent testimony in the appendix to his brief we might decline to consider this point, *R. R.* 1:7-1(*f*), 1:7-2. However, even from the scant record before us it is obvious that there was ample evidence to support the verdict. The defendant's previously signed statement and the testimony of Ritter alone clearly indicated that the defendant had been acquainted with "the Count" and thus swore falsely before the magistrate when he denied this fact. In addition the defendant makes no showing that the verdict was the result of mistake, partiality, prejudice or passion, *R. R.* 1:5-1(*a*), *State v. Goodman*, 9 *N. J.* 569, 582, 583 (1952); *State v. Peterson*, 10 *N. J.* 155, 163 (1952).

(6) The defendant urges on us that the trial court abused its discretion in imposing the sentence of a maximum of three and a minimum of two years in the State Prison and a fine of $1,000. The sentence represents a valid exercise of discretion by the trial court within the statutory limits and will not be disturbed by us, *In re Lewis*, 11 *N. J.* 217, 224 (1953).

The judgment is affirmed.

*For affirmance*—Chief Justice VANDERBILT and Justices OLIPHANT, WACHENFELD, BURLING and JACOBS—5.

*For reversal*—Justices HEHER and BRENNAN—2.