469 F.2d 1362
 UNITED STATES of America, Plaintiff-Appellee,
v.
Horace Lamar EDWARDS and Ronald Clifton, Defendants-Appellants.
 No. 72-1778.
 United States Court of Appeals,
Fifth Circuit.
 Dec. 4, 1972.
 
 Michael R. Gibson, El Paso, Tex. (court appointed), Robert R. Bryan, cocounsel Birmingham, Ala., for defendants-appellants.
 William S. Sessions, U. S. Atty., James E. Bock, James W. Kerr, Jr., Asst. U. S. Attys., San Antonio, Tex., for plaintiff-appellee.
 Before GEWIN, THORNBERRY and CLARK, Circuit Judges.
 CLARK, Circuit Judge:
 
 
 1
 Horace Lamar Edwards and Ronald Clifton have been jointly tried on three separate occasions on charges arising from two armed robberies occurring at Biggs Field, Fort Bliss, Texas. At the initial trial, Clifton was convicted on two counts of armed robbery and one count of unlawful possession of a firearm on a military reservation.[1] Edwards was convicted on one count of armed robbery and one firearm count. These convictions were reversed because of prejudicial instructions by the trial judge. United States v. Edwards, 447 F.2d 147 (5th Cir. 1971). The second trial resulted in a conviction of each defendant on the firearms charges, but the jury could not reach an agreement on the robbery charges and a mistrial was ordered on those counts. Subsequently, Clifton and Edwards were tried a third time and each was convicted of armed robbery. Following the third trial sentences were imposed on all convictions and Edwards and Clifton now appeal from trial two and trial three.
 
 I.
 
 2
 At each trial, the government introduced into evidence pistols taken from Edwards and Clifton at the time of their apprehension. As is usual in search suppression cases, the facts leading to the arrest of the defendants must be recounted in some detail. After 10:30 on the evening of June 30, 1970, Robert Lee Miller, who was standing guard at the Post Exchange at Biggs Field, was robbed at gunpoint by three black males. About thirty minutes later, Robert Alexander was robbed as he left a nearby NCO club. Five minutes after the second robbery, Alexander was interviewed at the scene by military police investigator Ronald Guy Hawkins. Alexander described the robbers as two black males, one tall and one short. He stated that the shorter man was dressed in fatigues and was wearing a bush or jungle hat. He also told Hawkins that the robbers had fled on foot.
 
 
 3
 A few minutes later, Hawkins heard a squeal of automobile tires and observed a car passing through an intersection. Hawkins pursued the car, which he testified exceeded the posted speed limits until it left the military post. When the car stopped at a traffic light outside the gate, Hawkins observed that the occupants were four black males, and that the driver was wearing a bush hat. The car then proceeded at a lawful rate of speed to a drive-in restaurant.
 
 
 4
 Hawkins, who had called for assistance upon observing the occupants at the traffic light, followed the car into the drive-in. After another military police vehicle arrived in response to his call for assistance, Hawkins approached the parked car and told the occupants, including Clifton, who was driving, and Edwards, the front seat passenger, that they were under arrest for a traffic violation and suspicion of armed robbery. The occupants were searched by other military policemen who discovered pistols in the clothing of both Clifton and Edwards.
 
 
 5
 At each trial the defendants made timely motions to exclude from evidence the two pistols found during this search. These pistols were the primary evidence on the charges of illegal possession of firearms on a military reservation and, along with identification of the defendants by the victims, were major evidence on the armed robbery charges. The government argued below and on appeal that the pistols were found in a search incident to a lawful arrest. However, we pretermit any consideration of this issue since we determine that the evidence was admissible under the principles announced in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L. Ed.2d 889 (1968). Terry recognizes that police officers have authority to approach a person for purposes of investigating criminal behavior even though there is no probable cause to make an arrest. "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous . . . .," the officer may conduct a limited frisk or self-protective search for weapons. A search to neutralize the threat of physical harm during an investigatory encounter is consistent with the Fourth Amendment, and, therefore, weapons discovered during such a search are admissible in subsequent prosecutions. 392 U.S. at 20-27, 88 S.Ct. at 1879-1883.
 
 
 6
 Terry suggests that a lawful search incident to an investigatory encounter must meet three criteria: (1) the officer must have reasonable grounds for approaching and detaining the subject; (2) the circumstances must warrant a belief that the subject is armed and dangerous; and (3) the search must be limited in scope to the discovery of readily accessible weapons.
 
 
 7
 The crux of this case thus becomes whether Hawkins had reasonable grounds to approach the appellants at the drive-in. In undertaking this inquiry, we follow the standard laid down by the Supreme Court in Terry:
 
 
 8
 [I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. . . . And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?
 
 
 9
 392 U.S. at 21-22, 88 S.Ct. at 1880.
 
 
 10
 In this case, Hawkins had personally observed the appellants' car in the vicinity of two armed robberies shortly after the crimes had been committed. The occupants fit the sex and race of the robbers and the driver was wearing a bush hat, a distinctive item of apparel described by one of the victims. This was sufficient information to justify surveillance and interrogation of the appellants, particularly since the alternative could have been to permit the most logical suspects to evade police identification for want of probable cause to make a formal arrest.
 
 
 11
 As the Ninth Circuit commented in applying Terry in circumstances quite similar to those of this case:
 
 
 12
 Under these facts the officers acted reasonably in stopping the Cadillac and questioning the occupants concerning their identity and residences. This was intelligent, effective police work. If police officers may not do what was done here, law enforcement would be seriously crippled. The Fourth Amendment was not intended to handcuff the police in their reasonable effort to handcuff criminals.
 
 
 13
 United States v. Jackson, 448 F.2d 963, 970 (9th Cir. 1971). Also see Coleman v. United States, 137 U.S.App.D.C., 48, 420 F.2d 616, 626-628 (1969) (J. Bazelon, concurring).[2]
 
 
 14
 Since Hawkins had a right to approach appellants and question them concerning their possible involvement in the armed robberies, it was entirely reasonable that he and his fellow military police officers conduct a limited, selfprotective search for weapons. If, as was reasonably thought possible, these were the robbers, Hawkins was aware that they would be armed with pistols which might be concealed on their persons.[3] As the Supreme Court recognized in Terry, a "policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect." Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972).[4]
 
 
 15
 Therefore the pistols seized from Clifton and Edwards were the product of a lawful search and no error was committed by permitting their introduction at either trial two or trial three.
 
 II.
 
 16
 The appellants raise several points on appeal which relate to trial three which resulted in convictions on the armed robbery counts. We first direct our attention to the circumstances surrounding the taking of the verdict.
 
 
 17
 After the foreman announced the verdict of the jury, the defendants requested a poll. When the poll reached the eight juror the following ensued:
 
 
 18
 THE COURT: Is this your verdict?
 
 
 19
 MRS. ARACELI VALLEJO: It's my verdict, but I am still in doubt.
 
 
 20
 THE COURT: All right, it's your verdict . . . [proceeding with the poll]
 
 
 21
 Upon completion of the poll, defense counsel moved for a mistrial or, in the alternative, that the jury be directed to retire for further deliberations. The Court then questioned Mrs. Vallejo as follows:
 
 
 22
 THE COURT: The juror stated that this is her verdict. Is that what you said?
 
 
 23
 MRS. VALLEJO: Yes, sir.
 
 
 24
 THE COURT: All right.
 
 
 25
 MR. BRYAN: Your Honor, I believe she said it was her verdict but she was still in doubt.
 
 
 26
 THE COURT: She has said that this is her verdict. Is that correct?
 
 
 27
 MRS. VALLEJO: Yes, sir.
 
 
 28
 THE COURT: All right. The verdict will be received.
 
 
 29
 Appellants contend that juror Vallejo's response indicated that the jury verdict was not unanimous and that the procedure followed by the trial court did not cure the lack of unanimity.
 
 
 30
 Fed.R.Crim.P. 31(d) establishes an absolute right to have the jury polled. The object of a poll is to give each juror an opportunity, before the verdict is recorded, to declare in open court his assent to the verdict which the foreman has returned and thus to enable the court and parties "to ascertain for a certainty that each of the jurors approves of the verdict as returned." Humphries v. District of Columbia, 174 U.S. 190, 194, 19 S.Ct. 637, 638-639, 43 L.Ed.2d 944 (1899). In this case, the poll indicated that at least one juror was "still in doubt." The government contends that this response does not necessarily indicate a lack of unanimity since it is not necessary to prove defendants guilty beyond all possible or conceivable doubt. We cannot accept this interpretation of the juror's words. Jurors are laymen, unskilled in the fine distinctions of the law. When a juror states that he has doubt, the trial judge should be alert to the probability that there may not be unanimity in the verdict.
 
 
 31
 We find this response indistinguishable from that given in United States v. McCoy, 139 U.S.App.D.C. 60, 429 F.2d 739 (1970). There, in response to the request to state "yes or no whether or not your verdict is the same as that given by your foreman," a juror answered "Yes, with a question mark." The trial judge instructed the juror to answer yes or no. She then responded "Yes." Finding the receipt of the verdict without further jury deliberation to be reversible error, the Circuit Court held that the juror's response had raised "doubts about the unanimity of [the] verdict." 139 U.S.App.D.C. at 63, 429 F.2d at 742. Also see Cook v. United States, 379 F.2d 966 (5th Cir. 1967), where response of several jurors conditioned on a recommendation of leniency was held to have indicated a lack of unanimity requiring clarification or further deliberation.
 
 
 32
 The government next contends that the questions from the bench clarified juror Vallejo's response so that further deliberation was unnecessary. To the contrary, at no time did Vallejo state unequivocally that she concurred in the verdict. Both questions from the bench were limited to whether or not she had spoken the words "it's my verdict." The trial judge refused to inquire into the meaning of the crucial phrase "but I am still in doubt."
 
 
 33
 However, our decision does not rest on the exact response extracted from the juror by the trial judge. In United States v. Sexton, 456 F.2d 961 (5th Cir. 1972), this court held that forcing a doubtful juror to state his verdict in the presence of the court, without further deliberation with other jurors, amounts to coercion and denies a defendant due process. In Sexton, one juror responded to the poll by stating that "I didn't vote either way." The Court then inquired "Well, is it your verdict?", to which the juror replied "Yes, sir." Upon request by the defendant, the court ordered the jury to retire for further deliberations, after which another poll showed that the verdict was then unanimous. This court reversed the conviction:
 
 
 34
 There can be no question of the right of a juror, when polled, to dissent from a verdict to which he has agreed in the jury room, and when that happens, the jury should either be discharged or returned to their room for further deliberation. It is both unwise and undesirable that the Court should enter into an argument with the juror or require an explanation of his change of position. . . .
 
 
 35
 The correct practice, when a poll of the jury is asked, is for the clerk to call the roll and ask each juror as his name is called to answer . . . and if the responses of the individual jurors are not in complete agreement, the jury should be required to retire and give further consideration. [Bruce v. Chestnut Farms-Chevy Chase Dairy, 75 U.S.App.D.C. 192, 126 F.2d 224, 225 (1942)]
 
 
 36
 456 F.2d at 966-967.
 
 Fed.R.Crim.P. 31(d) provides:
 
 37
 If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberations or may be discharged.
 
 
 38
 The holding of Sexton, which we follow today, is that where a poll indicates a lack of unanimity the trial court must refrain from attempting to extract unanimity by questioning from the bench and must either order the jury to retire for further deliberations or dismiss them.[5]
 
 
 39
 The procedure in this case was, if anything, more coercive than that disproved in Sexton, since in addition to extracting a vote from a juror in open court, the trial judge refused to order further deliberations before receiving the final verdict.[6]
 
 III.
 
 40
 The use of recorded testimony of key government witnesses during trial three also compels reversal of the convictions for armed robbery. In light of possible retrial we deem it appropriate to place our reversal of trial three on the use of this recorded testimony equally with the error discussed under Part II relating to the inconclusive verdict disclosed by the court's poll.
 
 
 41
 At trials one and two, the primary government witnesses on the armed robbery counts were the victims of the robberies, Miller and Alexander. Their identification of the defendants was the only direct evidence linking Edwards and Clifton to the robberies. At the third trial, the government, over the objection of defendants, read to the jury the testimony of the victims recorded at trial one.
 
 
 42
 On the date of trial three, one month after trial two at which the government had produced both victims as witnesses, Miller was a civilian living in Middleburg, Virginia, and Alexander was stationed with the United States Army in Germany. Although both men were subject to subpoena, the United States Attorney elected not to return them to El Paso to testify a third time, explaining that it would cost the government too much money.
 
 
 43
 Only Miller had been actually served with a subpoena in preparation for trial three. The United States Attorney informed the court that he had obtained a subpoena for Alexander, but that the subpoena had not yet been served by the military authorities in Germany.[7] The government did not suggest below or here that any difficulty barred obtaining the presence of either witness other than cost. The government followed the instructions of the court in refusing to produce Miller and Alexander for trial three. At the conclusion of trial two, which had resulted in a hung jury on the armed robbery counts, the trial judge commented: "But the next time, if this case is tried again, I'm going to force the parties to rely on the testimony given in these two records. I'm certainly not going to expose the government to any further expense of bringing witnesses back."
 
 
 44
 The use at a trial of recorded testimony of an available witness has consistently been held to deny the Sixth Amendment right of confrontation. See, e. g., Barber v. Page, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); Mattox v. United States, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895).
 
 
 45
 This well-established confrontation rule is subject to limited exceptions where it is impossible to obtain the presence of a witness who has testified at a previous trial. Two conditions must be met for the exception to obtain: (1) the witness must be shown to be unavailable to testify at the present trial and (2) the witness must have been subject to adequate cross-examination at a previous trial or hearing. Barber v. Page, supra; see Mancusi v. Stubbs, 408 U.S. 204, 92 S.Ct. 2308, 2317, 33 L.Ed. 2d 293 (1972) (J. Marshall, dissenting). "[A] witness is not 'unavailable' for purposes of the foregoing exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." Barber v. Page, supra 390 U. S. at 724-725, 88 S.Ct. at 1322. Even prior to Barber, this court had held the Sixth Amendment required a State to exercise "due diligence" to produce prosecution a witness before recorded testimony can be introduced. "The constitutional right of confrontation and crossexamination to the extent guaranteed by the Sixth . . . [Amendment] cannot be sidestepped because it happens to be convenient for one of the parties." Holman v. Washington, 364 F.2d 618, 623 (5th Cir. 1966).
 
 
 46
 The refusal of the government to return a prosecution witness whose whereabouts are known and who is subject to its subpoena power on the ground of excessive expense does not constitute either "due diligence" or a "good-faith effort to obtain his presence." As the Supreme Court commented in Pointer v. Texas, "There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." 380 U.S. 400, 405, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965); Berger v. California, 393 U.S. 314, 89 S.Ct. 540, 21 L.Ed.2d 508 (1969). This right of confrontation is too significant to be balanced against the expense of transporting an otherwise available witness to the place of trial.
 
 
 47
 On oral argument the government contends that the recent decision in Mancusi v. Stubbs, supra, eliminates the requirement that a witness be legally unavailable provided that his previous recorded testimony has been subject to adequate cross-examination. To the contrary, Stubbs clearly follows the twostep test outlined in Barber. The outcome of the application of the tests was different because the witness in Stubbs was shown to be unavailable.
 
 
 48
 In the present case, witnesses Miller and Alexander had been subject to extensive cross-examination by able defense counsel at two previous trials. However, the reading of the complete record of their testimony at these trials did not provide the opportunity, which the Supreme Court long ago held to be the heart of confrontation: "not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." Mattox v. United States, supra, 156 U.S. at 242-243, 15 S.Ct. at 339. The convictions in trial three based on the use of recorded testimony of Miller and Alexander must be reversed on this ground as well as because of the procedures followed in taking the poll of the jury.
 
 IV.
 
 49
 The appellants also complain of the denial of their trial three motions to subpoena defense witnesses at government expense.
 
 
 50
 While it is settled that district courts have wide discretion with respect to subpoenaing witnesses on behalf of indigents, this discretion is not absolute. See, e. g., Taylor v. United States, 329 F.2d 384 (5th Cir. 1964). The right of an accused to have compulsory process for obtaining witnesses in his favor is an important right which has an equal footing with the right of confrontation with prosecution witnesses. Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). Fed.R.Crim.P. 17(b) provides that the court shall order a witness produced at government expense "upon a satisfactory showing that the defendant is financially unable to pay the fees of the witness and that the presence of the witness is necessary to an adequate defense."
 
 
 51
 Since we reverse and remand, sound judicial husbandry dictates that we now indicate to the district court that this test of "necessity to an adequate defense" should not be resolved solely upon the ground that the testimony of the same witnesses, as recorded at a previous trial, is available. Whenever a credibility choice is crucial to the resolution of an issue of fact, the defendant is entitled to have the same jury then charged with guilt determination weigh credibility on the basis of their personal observations of the appearance and demeanor of the defendant's witnesses.
 
 CONCLUSION
 
 52
 The firearms convictions in trial two are affirmed. The robbery convictions in trial three are reversed.
 
 
 53
 Affirmed in part, reversed in part, and remanded.
 
 
 
 [1]
 18 U.S.C. Sec. 2111; 18 U.S.C. Sec. 13; and Vernon's Ann.Tex.Penal Code art. 483
 
 
 [2]
 Cf. Dodd v. Beto, 435 F.2d 868, 870 (5th Cir. 1970), cert. denied 404 U.S. 845, 92 S.Ct. 145, 30 L.Ed.2d 81 (1971)
 Our application of Terry to the confrontation between Hawkins and the appelpellants finds support in recent decisions of other circuits, e. g., United States v. Miller, 452 F.2d 731 (10th Cir. 1971), cert. denied 407 U.S. 926, 92 S.Ct. 2466, 32 L.Ed.2d 813 (1972); United States v. Alberty, 448 F.2d 706 (10th Cir. 1971); White v. United States, 448 F.2d 250 (8th Cir. 1971), cert. denied 405 U.S. 926, 92 S.Ct. 974, 30 L.Ed.2d 798 (1972); United States v. Harflinger, 436 F.2d 928 (8th Cir. 1970), cert. denied 402 U.S. 973, 91 S.Ct. 1660, 29 L.Ed.2d 137 (1971); Young v. United States, 140 U.S. App.D.C. 333, 435 F.2d 405 (1970); Carpenter v. Sigler, 419 F.2d 169 (8th Cir. 1969).
 See, generally, La Fave, "Street Encounters" and the Constitution: Terry, Sibron, Peter, and Beyond, 67 Mich.L. Rev. 40, 62-84 (1968).
 
 
 [3]
 Hawkins testified that he saw Clifton, the driver of the car, move his hand towards his pocket as Hawkins approached the vehicle on foot. Clifton's weapon was subsequently found in his hip pocket
 
 
 [4]
 Since the search revealed weapons in the outer clothing of the appellants, this case raises no problems in regard to the proper scope of a self-protective search. Compare United States v. Davis, 441 F.2d 28 (9th Cir. 1971); United States v. Morris, 142 U.S.App.D.C. 196, 440 F.2d 224 (1970)
 
 
 [5]
 A limited exception to the bar of questioning from the bench exists in cases where it is apparent that the juror is confused about the questions asked during the poll, cf. Williams v. United States, 136 U.S.App.D.C. 158, 162, 165, 419 F.2d 740, 744-747 (1969) or where a juror's dissent has resulted from an inadvertent slip of the tongue, cf. Slocum v. United States, 325 F.2d 465 (8th Cir. 1963). We do not reach the question of what instructions, if any, the trial judge may give to the jury upon ordering them to retire for further deliberations. Cf. United States v. Bailey, 468 F.2d 652 (5th Cir. 1972), rehearing en banc granted
 
 
 [6]
 For an example of proper procedure, see United States v. Bendicks, 449 F.2d 313, 315 (5th Cir. 1971)
 
 
 [7]
 In Peterson v. United States, 344 F.2d 419, 425 (5th Cir. 1965) this court reversed a conviction obtained through the use of recorded testimony of a witness who was pregnant at the time of the second trial. The court held that in case of temporary unavailability, the government must either request a continuance or proceed without the use of the absent witness