**UNITED STATES of America**

v.

**Sylvester LOCKHART and Donald Edward Maddox, Jr.**

**Crim. No. 72–59.**

United States District Court,
E. D. Pennsylvania.

Nov. 14, 1973.

---

Robert E. J. Curran, U. S. Atty., C. Oliver Burt, III, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Richard P. Hunter, Jr., Philadelphia, Pa., for defendant Maddox.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

■ At the conclusion of a three-day jury trial, the foreman of the jury announced a guilty verdict on all three counts of an indictment charging defendant Donald Maddox (Maddox) with illegal distribution of heroin on two separate occasions and with conspiracy.[1] The events which occurred during a poll of the jury are the sole grounds of substance in Maddox's motion for a judgment of acquittal or a new trial.[2]

The jury poll was requested by Maddox's counsel as a matter of routine.

1. Maddox was tried alone, because his co-defendant, Sylvester Lockhart, did not appear when the case was called, and we therefore granted the government's motion for severance. This was the second trial for Maddox. At the first trial, he and Lockhart were tried jointly and Maddox was convicted on all three counts while Lockhart was convicted on Count III (the only count on which he was charged). However, in a Memorandum and Order filed on March 15, 1973, we granted a new trial because of the admission of certain improper and prejudicial evidence.

2. Defendant's contention that the government's evidence was legally insufficient is totally without merit. The government's evidence consisted principally of eyewitness testimony that Maddox engaged in a hand-to-hand transaction in which he delivered a quantity of heroin to an undercover agent of the Bureau of Narcotics and Dangerous Drugs (BNDD). BNDD Agent Ronald Boston testified that he met Maddox in Philadelphia at the Soft Winds Lounge on the afternoon of October 28, 1971, and that in the presence of the government informant, Emmett Bethea, Maddox gave him two small bags of heroin. Boston further testified that on the afternoon of November 2, 1971, Maddox sold him one ounce of heroin in a room on the second floor of Emmett's Sea Food and Grocery store, 1827 Tioga Street, Philadelphia. This transaction was preceded by a meeting with Maddox and his codefendant, Lockhart, in which Agent Boston haggled with Lockhart over the price of the heroin.

Boston's testimony as to the first transaction was corroborated by the testimony of BNDD Agent Donald Abrams who conducted surveillance on the afternoon of October 28th, 1971, at which time he saw Boston enter and leave the Soft Winds Lounge and later saw Maddox drive away from the vicinity of the Soft Winds in his car. Boston's account of the November 2nd transaction was corroborated by the testimony of BNDD Agent James Glauner who described his surveillance activities in the vicinity of Emmett's Sea Food and Grocery store. Boston's account of both transactions was further corroborated by the testimony of the informant, Emmett Bethea, who was called as a defense witness.

Counsel stipulated that the white powder obtained by Boston on each occasion was determined by chemical analysis to be heroin. Taken as a whole, this evidence is more than ample to sustain Maddox's conviction on all three counts.

The poll proceeded uneventfully until it reached juror number 4. Thereupon the following occurred:

THE COURT: Mrs. Garro, how do you find the defendant, Donald Maddox, guilty or not guilty [as to Count I]?

JUROR NO. 4: Guilty.

THE COURT: And as to Count 2?

JUROR NO. 4: I am not sure.

THE COURT: As to Count 2 you say you are not sure?

JUROR NO. 4: I'll say guilty.

THE COURT: And as to Count 3?

JUROR NO. 4: Guilty.

Defense counsel thereupon moved for a mistrial. The prosecutor asked to see us at sidebar. There ensued an off-the-record discussion in which the prosecutor asked that we repoll juror No. 4 and defense counsel asked that we repoll juror No. 2 who had hesitated before announcing his verdict during the poll. The following colloquy thereupon occurred at sidebar:

MR. BURT: I think, perhaps, we should repoll that juror, Mrs. Garro.

THE COURT: I will repoll Juror No. 2, also. Juror No. 2, I think, has a nervous defect, and I think that is what caused his hesitation.

Is there a request I repoll Juror No. 4?

MR. HUNTER: And No. 2.

We deferred ruling on the mistrial motion and concluded the poll. The remaining jurors announced guilty verdicts on all three counts.

We then commenced the repolling of jurors No. 2 and No. 4. What occurred was as follows:

THE COURT: Now, I have been requested to repoll two jurors, Jurors No. 2 and No. 4.

Mr. Eby [Juror No. 2], would you stand again.

How do you find the defendant, Donald Edward Maddox, as to Count 1?

JUROR NO. 2: Guilty.

THE COURT: And as to Count 2?

JUROR NO. 2: Your Honor, may I explain?

THE COURT: Yes.

JUROR NO. 2: I think what—I can speak for myself. As you instructed us, it was—you instructed us to make your decision on a collective wisdom of the twelve, and although you said the only reason you should feel that a verdict of not guilty is if you have reasonable doubt. And if such the collective wisdom has eliminated the reasonable doubt and you are still not sure but it isn't a reasonable doubt—what I am trying to say is you said not a mathematical certainty but you still could be unsure. But you still must go along with a guilty verdict in that particular instance.

THE COURT: That was certainly not my instruction, Mr. Eby. My instruction was that it must represent the individual verdict of each juror and that each juror must decide the case for himself. Well, in any event, I take it that you voted for a verdict of guilty on each of the three counts in the deliberations?

JUROR NO. 2: Yes, sir.

I thought the verdict had to be unanimous. I am saying I have my own—I would go with the guilty verdict.

THE COURT: I am now asking for your individual verdict on Count 1.

JUROR NO. 2: Guilty.

THE COURT: And on Count 2?

JUROR NO. 2: Guilty.

THE COURT: And on Count 3?

JUROR NO. 2: Guilty.

THE COURT: Do you have a reasonable doubt on Count 1?

JUROR NO. 2: No, Your Honor.

THE COURT: Do you have a reasonable doubt on Count 2?

JUROR NO. 2: No, Your Honor, not a reasonable doubt.

THE COURT: And how about on Count 3?

JUROR NO. 2: No.

THE COURT: Mrs. Garro [juror No. 4], what is your verdict on Count 1?

JUROR NO. 4: Guilty.

THE COURT: And on Count 2?

JUROR NO. 4: Guilty.

THE COURT: And on Count 3?

JUROR NO. 4: Guilty.

THE COURT: Now, do you have a reasonable doubt as to the guilt of the defendant, Donald Maddox, on Count 1?

JUROR NO. 4: No.

THE COURT: Do you have a reasonable doubt on Count 2?

JUROR NO. 4: No.

THE COURT: Do you have a reasonable doubt on Count 3?

JUROR NO. 4: No.

THE COURT: Now, Mrs. Garro, when this jury was first polled and I inquired of you on Count 1, you said "guilty." When I inquired of you on Count 3, you said "guilty." When I inquired of you on Count 2, you said that you were not sure. Now, are you still not sure on Count 2?

JUROR NO. 4: Now I am sure.

THE COURT: Very well.

May I see counsel in chambers?

(The following took place in chambers:)

THE COURT: Mr. Burt, what is your suggestion as to what we do at this point?

MR. BURT: Your Honor, my suggestion is that the jury as a group be asked would they like to return for further deliberations. I do not think any more attention should be focused on any individual juror in open court or in chambers. I don't see how we can possibly talk to any individual juror alone at this point without irrevocably contaminating any later verdict.

THE COURT: Mr. Hunter?

MR. HUNTER: Your Honor, as to Juror No. 4, she did, indeed, say as to her second verdict she was not sure. I would ask the Court to ask her in open court what did she mean when she said "not sure."

As to Juror No. 2, he spoke at some length as to what his thoughts were about various charges and what happened, and I honestly don't understand what he meant. He seemed to be hesitant, and I would ask you to conduct a further colloquy with him either in open court or in chambers.

MR. BURT: If I can respond to that. I think as to Juror No. 4, it would be just plain improper to inquire into her mental reasoning process in open court or anywhere else.

As to Juror No. 2, I think that the Court went back and explained that he has to have his own individual verdict and does he have a reasonable doubt, and he said he had no reasonable doubt. I think it is apparent, very clear from what he said— and I think he was rather articulate —he has no reasonable doubt on any of the three counts.

THE COURT: What I propose to do is to re-read to the jury the charge that I gave them on unanimity of verdict, and I'll ask each of the jurors individually whether they would like to go back and deliberate further. . . .

We then re-read our charge on unanimity of verdict, emphasizing that each juror was obligated to reach his own judgment. We also asked the jury as a whole and each juror individually if any of them would like to return for further deliberations. None did.

Defense counsel made a final request that the Court repoll the jurors, and in particular ask juror No. 4 what she meant when she said "not sure." We rejected his request since we felt that additional polling might appear coercive or lead the jurors to think that we were

dissatisfied with the verdict that they had already given three times. Furthermore, we considered it inappropriate to delve into the mental processes of juror No. 4, or try to impeach her verdict, especially since she had already unequivocally clarified her verdict on all counts. We were satisfied that the verdict was unanimous and we accepted and recorded the jury's verdict of guilty on all three counts.

Maddox now moves for an acquittal or new trial in light of the events occurring during the jury poll. He contends that the Court erred in questioning the jurors when the initial jury poll indicated some lack of unanimity. More specifically, he argues that in seeing the hesitancy of juror No. 2, and upon hearing juror No. 4 respond "not sure," we should have been warned that there probably was not unanimity in the verdict, and that we should not have held an in-court colloquy with the various jurors, but instead should have granted defense counsel's motion for a mistrial or should have returned the jury to the jury room for further deliberations. Finally, Maddox argues that in light of the demeanor and manner of jurors Nos. 2 and 4, the Court and the parties could not ascertain to a certainty that each of the jurors approved of the guilty verdict on all three counts.

■ In approaching defendant's contentions, we must make a critical distinction at the outset between count 1 of the indictment and the congeries of counts 2 and 3. Count 1 charged Maddox with knowingly and intentionally distributing about 1.4 grams of heroin on or about *October 28, 1971*, in violation of 21 U.S.C. § 841(a)(1). Count 2 dealt with a separate violation of the same statute, this time involving the distribution of about 19 grams of heroin on or about *November 2, 1971*. Count 3 charged Maddox and the co-defendant, Sylvester Lockhart, with conspiring on or about November 2, 1971, in the unlawful distribution of heroin set forth in count 2. The distinction between the violation in count 1 and those covered by

counts 2 and 3 is important because no problems arose during the poll with regard to count 1. Mrs. Garro's "not sure" came after she unequivocally had declared defendant to be guilty on count 1. Mr. Eby's "may I explain" also came on count 2, after he unhesitatingly had declared defendant to be guilty on count 1. We were then and still are satisfied that none of the jurors had any doubt as to the guilty verdict on count 1. That confidence and our belief as to the divisibility of count 1 from counts 2 and 3 is underscored by the fact that the evidence on count 1 related to an entirely separate transaction. While there were some minor discrepancies in the government's case with respect to count 3 (which the jury resolved in the government's favor), there were none with respect to count 1. And the thrust of the defense (such as it was, for defendant did not take the stand) was directed to the second transaction (counts 2 and 3), not count 1. Since we will sentence Maddox for less than the maximum allowed under count one alone, and give only concurrent sentences on counts 2 and 3, any difficulties raised by the jury's verdict on counts 2 and 3 will not lead to an injustice.

However, our denial of defendant's motions does not rest solely upon the divisibility of count 1 from counts 2 and 3. For in our view, neither the statements of juror No. 4 nor those of juror No. 2 give rise to grounds for judgment of acquittal or a new trial. Our conclusion is supported by the caselaw on the polling of jurors.

■ Certain principles emerge from the relevant cases. The object of giving a defendant the right to have the jury polled is to give each juror an opportunity before a verdict is recorded to declare in open court his or her assent to the verdict and thus to ascertain with certainty that a unanimous verdict was reached and that no juror was coerced or improperly induced to agree to it. United States v. Grosso, 358 F.2d 154 (3d Cir. 1966), rev'd on other grounds, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906

(1968). A trial judge has discretion in assessing the impact of a dissenting vote during a jury poll; reasonable exercise of this discretion is accorded proper deference by a reviewing court. *United States v. Brooks*, 137 U.S.App.D.C. 147, 420 F.2d 1350 (1969). The fact that there is some uncertainty in the first instance concerning a verdict does not require setting aside the trial and verdict if polling the jury can clear up apparent confusion. *Williams v. United States*, 136 U.S.App.D.C. 158, 419 F.2d 740 (1969).

Maddox cites several cases in support of his position. In *United States v. Edwards*, 469 F.2d 1362 (5th Cir. 1972), a juror said, "It's my verdict, but I am still in doubt." The trial court then asserted, "All right, it's your verdict . . ." and proceeded with the poll of other jurors. When the defendant in *Edwards* moved for a mistrial or that the jurors be directed to retire for further deliberations, the court responded by saying to the doubting juror: "The juror stated that this is her verdict. Is that what you said?" The Fifth Circuit found this type of questioning coercive and noted:

> The government next contends that the questions from the bench clarified juror Vallejo's response so that further deliberation was unnecessary. To the contrary, at no time did Vallejo state unequivocally that she concurred in the verdict. Both questions from the bench were limited to whether or not she had spoken the words "it's my verdict." The trial judge refused to inquire into the meaning of the crucial phrase "but I am still in doubt."

*Id.* at 1367. Defendant relies on *Edwards* for the proposition that a judge must refrain from attempting to extract unanimity by questioning from the bench and must either order the jury to retire for further deliberations or dismiss them. *Edwards* is distinguishable from the facts here since the trial judge there reformed the juror's statement into a verdict, and when this action was challenged, the judge put a leading question to the juror whose response was all but inevitable.

Defendant also relies on *United States v. Sexton*, 456 F.2d 961 (5th Cir. 1972). In *Sexton*, one juror responded to the poll by stating that "I didn't vote either way." The trial court then inquired, "Well, is it your verdict?", to which the juror replied, "Yes, sir." Upon request of defense counsel, the trial court ordered the jury to retire for further deliberation, after which another poll showed a unanimous verdict. Nevertheless, the Fifth Circuit reversed the conviction on the ground that forcing a doubtful juror to reach and state his verdict for the first time in the presence of the court and without first having further deliberations with other jurors amounts to coercion and denies a defendant due process. Again in *Sexton*, as in *Edwards*, coercion was the underlying reason for reversing the trial court.

Defendant notes one other case that is also distinguishable. In *United States v. McCoy*, 139 U.S.App.D.C. 60, 429 F.2d 739 (1970), one juror answered the poll by saying "Yes, with a question mark." The trial judge then instructed the juror to answer "yes or no." When the juror responded "Yes," the court accepted the verdict without any further inquiry. The Court of Appeals reversed because the juror was forced to respond to the court's directive to say yes or no, and since she did not have sufficient opportunity to return for deliberations or clarify her verdict as unequivocal.

In the instant case, on the other hand, we find no evidence either on the cold record, or in our recollection of the subjective quality of the colloquy, that any juror was coerced or improperly influenced to return a guilty verdict. Our initial reaction to juror No. 4's (Mrs. Garro's) "not sure" was a spontaneous, indeed, a veritable reflex query where we asked: "As to count 2, you say you are not sure?" We in no way intended to nor coerced or even influenced the juror into a particular answer; we believe

that our intonation conveyed surprise rather than any pressure. Mrs. Garro's response to our query was a firm and spontaneous vote for a guilty verdict on all three counts. We gave her repeated opportunities, without any effort to influence her, to clarify if she was sure beyond a reasonable doubt or wanted to reject the guilty verdict or return for more deliberations. She unhestitatingly rejected further deliberations and unequivocally reasserted her guilty verdict. Mrs. Garro's demeanor and repeated assent to the guilty verdict on all three counts convinced us that she did not have a "reasonable doubt" when she gave her verdict, in spite of her isolated statement of "not sure." [3] Moreover, it would have been improper for us to delve into her reasoning by pressing her to explain why she once said "not sure." [4] In exercising our discretion and

3. Furthermore, a juror may be "not sure" in terms of absolute certainty and still reach a guilty verdict beyond a reasonable doubt, for it is not necessary that the government prove guilt beyond all possible doubt or to a certainty.

4. We believe that we acted properly in refusing to delve into Mrs. Garro's reasoning or pressing her to explain why, after having voted for the guilty verdict in the jury room (there is no indication to the contrary), she said "not sure" as to count 2. The issue before us in this case is whether there was a unanimous verdict (we have found that there was) and not whether an otherwise unanimous verdict has been tainted and may therefore be impeached by evidence of what occurred in the minds of the jurors and in the jury room. However, insofar as we are confronted with the problem of whether Mrs. Garro's mental processes should have been exposed, the impeachment cases are instructive. *See generally* 8 Wigmore §§ 2348–2357; Subcomm. on Post-Trial Interrogation of Jurors of the Judicial Conference Comm. on Operation of the Jury System, Report—May 1, 1972 (Appendix B).

One leading case on impeachment is Jorgensen v. York Ice Machinery Corp., 160 F. 2d 432 (2nd Cir. 1947), an opinion by Judge Learned Hand. In *Jorgensen*, affidavits submitted after the entry of judgment alleged that the jury was deadlocked at seven for the defendant and five for the plaintiff, when the foreman learned his son had been killed. At this point the jury agreed to follow the majority in order to avoid further discussion and to let the foreman go home. Upholding the trial court's denial of a new trial, Judge Hand wrote:

[I]t would be impracticable to impose the counsel of absolute perfection that no verdict shall stand, unless every juror has been entirely without bias, and has based his vote only upon evidence he has heard in court. It is doubtful whether more than one in a hundred verdicts would stand such a test; and although absolute justice may require as much, the impossibility of achieving it has induced judges to take a middle course, for they have recognized that the institution could not otherwise survive; they would become Penelopes, forever engaged in unravelling the webs they wove. Like much else in human affairs, its defects are so deeply enmeshed in the system that wholly to disentangle them would quite kill it. The discussion of Lamar, J., in McDonald v. Pless, supra [238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915)], well states the necessary compromise. . . .

All this has, however, nothing to do with what evidence shall be competent to prove the facts when the facts do require the verdict to be set aside, as concededly some facts do. . . . Drunkenness, bribery, receiving incompetent documents, or privately interviewing a party, do require it; but there are many irregularities, which, however proved, do not, and among them is an agreement to abide by the vote of the majority. Indeed, that is a no greater impropriety than a "quotient" verdict which the Supreme Court sustained in McDonald v. Pless, supra, and the Eighth Circuit in Manhattan Oil Co. v. Mosby [72 F.2d 840 (1934)]. Not only ought we not upset the judge's discretion in refusing to grant a new trial for such a reason; but, had he granted the motion, and had his order been in some unknown way appealable, we should not have sustained it.

*Id.* at 435 (footnotes omitted).

A more recent discussion of the issue is found in Grace Lines, Inc. v. Motley, 439 F. 2d 1028 (2d Cir. 1971). There, the jury returned a verdict for the defendant, and the clerk polled each juror. According to the court's opinion, the following then transpired:

According to the Reporter's minutes Juror No. 11 replied, "Yes it had to be unanimous." (On November 19th the court recollected that Juror No. 11 actually said at this point, "Yes, only insofar as it had to be unanimous.") The court inquired, "Have you some explanation for your statement Mrs. Rosmarin?" and Juror No. 11 said, "The verdict, as I understand, had to be one hundred per cent in favor

judgment, we found that Mrs. Garro meant to assent to the unanimous jury verdict of guilty on all three counts.

█ We probably should not have re-polled juror No. 2 (Mr. Eby) or allowed him to explain his verdict on count 2, since he had already said "guilty" once before. (See note 4, *supra*.) Nevertheless, in our effort to clarify any confusion and hesitation over the verdict, we permitted him to explain his verdict. Mr. Eby's statement raises two issues: (1) whether he had an essentially accurate understanding of our charge on reasonable doubt; and (2) whether his reference to "collective wisdom" reflected a fundamental misunderstanding of our charge, especially the unanimity instruction. We find no problem with Mr. Eby's understanding of reasonable doubt. He properly interpreted our charge to mean that he did not need to be sure to a mathematical certainty, as long as he was sure beyond a reasonable doubt.[5]

The unanimity question arises from our reference, at an early stage of our charge, to the Anglo-American system of jurisprudence and the jury system. In impressing upon the jurors the nature and importance of their role, we observe that "the collective wisdom and the collective judgment of twelve jurors is superior to that of a single judge in determining the truth of facts." However, at the end of our charge, we gave our usual instruction on unanimity that emphasized the obligation of each individual juror to reach his or her own judgment.[6] Accordingly, we believe that

and we had to present one statement. I was, I think the only one that held out and there was no possibility of any change and because of that I did."

The issue presented in *Grace Lines* was whether the motivation of the juror was so *unlawful* or *improper* as to require the court to impeach her vote and reject the verdict. Writing separate opinions, Judges Anderson and Lumbard upheld the jury's verdict. Judge Anderson held that there was nothing in the record to indicate that the juror was surrendering a "conscientious conviction." Judge Lumbard reasoned along similar lines in holding that it is proper for a juror to agree upon a verdict as long as he does so "without violating his individual judgment and conscience." Judge Lumbard added:

In this case there was no basis for the district judge to find that the one juror did not in fact agree at the time the verdict was rendered. The juror never said that it was not her verdict. On the contrary it was implicit in her statement that she gave up her views and that she did in fact ultimately agree so that the verdict would be unanimous. Under our system this was a good and proper reason, and *it merits no further cross-examination either by the court or by anyone else.*

*Id.* at 1034 (footnote omitted) (emphasis added). We agree with Judge Hand's and Judge Lumbard's views and deem them applicable here.

5. Concerning reasonable doubt, Mr. Eby said: "[A]nd you are still not sure but it isn't a reasonable doubt—what I am trying to say is you said not a mathematical certainty but you still could be unsure."

6. As we said in our charge:

Now, I instruct you that when you retire to deliberate on this case, each juror should exercise his or her individual judgment so that when a verdict is agreed upon it will constitute the verdict of each individual juror.

In arriving at a verdict, each juror should give due consideration to the views and opinions of the other jurors. However, no juror should agree upon a verdict unless he is convinced that the same is correct and such as his conscience approves and such as each juror under his oath after full consideration believes to be right. The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict, therefore, must be unanimous.

It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight, or effect of the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict. Remember, at all times you are not partisans, you are judges; judges of the facts. Your sole interest is to seek the truth

there could be no question but that the jurors understood that the verdict had to express the considered judgment of each juror as well as being unanimous. In retrospect, our concern over Mr. Eby's reference to "collective wisdom" diminishes. First, as we read Eby's response, it appears that his reference to collective wisdom refers simply to the process of dialogue within the jury insofar as the views of one juror affect another.[7] Second, we believe that our original charge on unanimity prevented any possible misunderstanding of the "collective wisdom" comment. Third, and to dispel any problem, we reiterated our instruction on unanimity during the jury poll process, following which we asked the jurors individually and collectively whether they would like to return for further deliberations. Mr. Eby replied negatively, as did all the other jurors.

 There is one final point which should be mentioned—whether Mr. Eby's response reflects a form of acquiescence that taints his verdict.[8] That problem is disposed of by note 4, *supra* and by Grace Lines v. Motley, *supra*, which upheld a verdict that the juror gave without "surrendering a conscientious conviction" (J. Anderson) or "violating his individual judgment or conscience" (J. Lumbard). As Judge Lumbard explained:

> Moreover, a reasonable juror knows that even though he might prefer to have the jury reach a different result, it is also important that it reach some result. . . .
>
> Indeed, it [i. e., reaching a result] is certainly a proper reason for concurring with the majority. . . .
> Were the court permitted to examine jurors to elicit whether they had surrendered their views, there would be

few verdicts which could withstand such examination.

Furthermore, insofar as Mr. Eby volunteered an extraneous explanation, it may be disregarded. The ABA Standards Relating to Trial by Jury (Approved Draft 1968) states at 162:

> The poll should be conducted so as to obtain an unequivocal expression from each juror. If this is obtained, then any volunteered statements by the juror in explanation of his verdict may be disregarded.

*Accord:* Grace Lines, Inc. v. Motley, *supra* at n. 2; People v. Burnett, 204 Cal. App.2d 453, 22 Cal.Rptr. 320 (1962); State v. Schmelz, 17 N.J. 227, 111 A.2d 50 (1955).

After all our efforts to clarify any confusion about the individual juror's verdicts, it appeared to us that each juror individually and the jury as a whole were well satisfied with the verdict of guilty on all three counts. Accordingly, we deny defendant's post-trial motions.

---

from the evidence in the case. Your verdict must be guided alone by the evidence and by the instructions given you by the Court.

7. As Mr. Eby stated: ". . . if such collective wisdom has eliminated the reasonable doubt. . . ."

8. Mr. Eby said:
   I thought the verdict had to be unanimous. I am saying I have my own—I would go with the guilty verdict.