Joseph TAYLOR

v.

UNITED STATES of America.

Civ. A. No. 73–2678.

United States District Court,
E. D. Pennsylvania.

Dec. 10, 1974.

Max Meshon, Philadelphia, Pa., for plaintiff.

William McGettigan, Asst. U. S. Atty., Robert E. J. Curran, U. S. Atty., Philadelphia, Pa., for defendant.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This is a proceeding under 28 U.S.C. § 2255 which stems from the conviction of petitioner Joseph Taylor (Taylor) on seven counts of an indictment charging the sale of stolen motor vehicles transported in interstate commerce in violation of 18 U.S.C. § 2313. The conviction, on June 16, 1970, followed an eight-day jury trial and resulted in Taylor's being sentenced to nine years in prison and $28,000 in fines by the late Judge Ralph C. Body. The conviction was affirmed by the Court of Appeals, 469 F.2d 284 (3d Cir. 1972).

Taylor's § 2255 petition alleges that his conviction violated his constitutional rights to an impartial jury and to the effective assistance of counsel, and he moves to vacate the judgment of conviction. His collateral attack upon his conviction is basically three pronged. First, Taylor asserts that the conviction was tainted by the prejudice of a juror with whom he had been acquainted in years gone by but whom he failed to recognize while the jury was being chosen. About six to eight months after the conviction the juror, John English (English), is said to have told his brother that (as a member of the jury) he "screwed" Taylor.[1] Second, Taylor maintains that he was deprived of the effective assistance of counsel in view of the failure of his attorney, David N. Savitt, to persist in voir dire in interrogating English when he stated, in response to a voir dire question posed generally to all jurors, that he "believed he recognized Taylor." Finally, Taylor claims that his rights to an impartial jury and a fair trial were infringed because of the absence of the trial judge from the bench during the allegedly offending voir dire.

Notwithstanding our reservations that the taking of testimony on the petition might be tantamount to the impeachment of a jury verdict in violation of settled principles of law concerning such matters,[2] we conducted an exten-

---

1. English was also the jury foreman.

2. See, for instance, our opinion in United States v. Lockhart, 366 F.Supp. 843 (E.D. Pa.1973) and in particular our reference in footnote 4 to Judge Learned Hand's opinion in Jorgenson v. York Ice Machinery Corp.,

160 F.2d 432 (2d Cir. 1947). Jorgenson is the case most often cited for the principle that a jury verdict may not be impeached. Judge Hand wrote:

[I]t would be impracticable to impose the counsel of absolute perfection that no verdict shall stand, unless every juror has

sive hearing at which we heard testimony from English, Taylor, Taylor's then attorney (David Savitt), the prosecuting attorney (Thomas J. McBride), and several others. Based upon that testimony we now make factual findings to be followed by a discussion of the applicable law. For reasons which will appear, we deny relief.

## II. *Findings of Fact*

### A. *Prejudice of the Juror*

The relationship between Taylor and the juror English emerged from the following facts. Following the War, in 1946, English joined his father's construction business which was, and is today, located at 1606 N. Carlisle Street in Philadelphia, Pennsylvania. In late 1953 or 1954, Taylor moved to the same block of Carlisle Street and began operating an automobile body and fender repair shop at 1620 N. Carlisle Street. Taylor remained at that location for approximately five years before moving elsewhere. During the period of time that Taylor's business existed on Carlisle Street and up until the present time, English's business was often inconvenienced by the blockage of Carlisle Street with wrecked automobiles awaiting repair in either Taylor's shop or one of several other repair shops on that block. The task often fell upon English to search out the garage which had left the cars in the street and persuade its operator to remove them. English did not usually obtain much cooperation in his efforts and in many instances it became necessary for him to summon a truck

---

been entirely without bias, and has based his vote only upon evidence he has heard in court. It is doubtful whether more than one in a hundred verdicts would stand such a test; and although absolute justice may require as much, the impossibility of achieving it has induced judges to take a middle course, for they have recognized that the institution could not otherwise survive; they would become Penelopes, forever engaged in unravelling the webs they wove. Like much else in human affairs, its defects are so deeply enmeshed in the system that wholly to disentangle them would quite kill it. . . .

More recently, in United States v. Dioguardi, 492 F.2d 70 (2d Cir. 1974), the court affirmed the refusal of the trial court to pursue various post-verdict letters received by the defendant which strongly indicated the mental incompetency of one of the jurors on the case. Though *Dioguardi* did, indeed, speak in impeachment of jury verdict terms, it was before the court in the context of a motion pursuant to 28 U.S.C. § 1865(b)(4) and thus, we think, not subject to the requirements of § 2255 which provides in pertinent part:

Unless the motion and the files and records of the case *conclusively show* that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto.

(emphasis added). The Supreme Court has liberally construed the phrase "conclusively show" to require a hearing unless "under no

circumstances could the petitioner establish facts warranting relief under § 2255." Fontaine v. United States, 411 U.S. 213, 93 S. Ct. 1461, 36 L.Ed.2d 169 (1973). Since we could not say that under no circumstances could petitioner be entitled to relief when faced only with petitioner's complaint and the records of his trial, we conclude, notwithstanding *Dioguardi*, that we were correct in affording Taylor his hearing.

We draw further support for our decision to hold a hearing from the decision in United States ex rel. Luzzi v. Banmiller, 248 F.2d 303 (3d Cir. 1957). In that case a prisoner in a state facility sought a writ of habeas corpus from the District Court alleging that he was denied an impartial jury when the sister-in-law of the complaining witness in a larceny and firearms trial was inadvertently permitted to serve as a juror. After holding an evidentiary hearing on the matter, the District Court denied relief. In affirming that decision the Court of Appeals noted:

The method of the trial judge in seeing to it that the evidential background of the serious issues urged by appellant was conscientiously explored at a hearing called for the purpose and just as conscientiously resolved, well illustrates the proper use of the Brown v. Allen doctrine.

248 F.2d at 306. Though *Luzzi* and *Brown* were both cases dealing with habeas corpus petitions rather than § 2255 motions, we think the policy considerations identical. In any event, we requested the opinion of counsel on the propriety of taking testimony on the petition and both the Government and counsel for petitioner agreed that our course was the proper one.

from his own place of business and have it push the cars out of the way. English admitted to having a "short fuse" and we find that in situations where he did not receive cooperation from petitioner or other repairmen he would often lose his temper.[3] We also find, however, that on these occasions English regained his temper and forgot the incident as soon as the problem was rectified, usually within five or ten minutes. Accordingly we credit English's testimony and find as a fact that, neither at the time of his North Carlisle Street encounters with Taylor, nor at the time of trial over a decade later did English possess any bias or grudge against Taylor.[4] We further find, on the basis of English's uncontradicted testimony, that at no time did English speak of his prior acquaintance with Taylor to any other member of the jury.[5]

The remaining allegation of the partiality of English stems from an alleged conversation about six months after trial between Taylor (who remained free on bail pending his direct appeal) and Frank English, the brother of the jury foreman, John English. The conversation was with regard to an unrelated business matter.[6] During the course of that conversation, Frank English allegedly told petitioner that his brother had told him that he had "screwed" Taylor. Although it was originally unclear whether this statement was alleged to refer to Frank English's opinion of what his brother had done, or Frank English's recitation of what his brother had told him he had done, further testimony made clear that Taylor was alleg-

---

3. Our finding that English would on occasion lose his temper is meant to indicate nothing more than a stream of expletives aimed at petitioner or whomever the offending repairman happened to be.

4. (R. 67–68):
   Q. Mr. English, at the time Mr. Taylor was on Carlisle Street did you at any time harbor any ill feelings against him even only for a short period of time? Were you ever mad at him?
   A. No.
   Q. At the time you were summoned prior to your being sworn in as a juror when you were asked about whether or not you knew Mr. Taylor, did you have any attitudes or feelings at that time anti Mr. Taylor or any prejudices or grudges against him at that time?
   A. No.

5. Taylor urges upon us the argument that English's prejudice was compounded by the events that occurred after petitioner left Carlisle Street 17 years ago. We quote from the transcript of the hearing: (R. 15)
   THE COURT: Your argument is that even though Mr. Taylor may have left in 1957, that assuming Mr. Taylor was a street clogger, that the antagonisms which the English's may have had toward subsequent street cloggers, people who were in the auto-body business, or what have you, somebody dumping wrecks in the street would have been visited by Mr. English, as jury foreman, on Mr. Taylor?
   MR. MESHON: Absolutely. He associates this gentleman with all the difficul-

ties he has had on that street. That is the point I am attempting to develop.
   THE COURT: That is a tough row to hoe, Mr. Meshon. But you undertake it and I will permit you to pursue it.
   Indeed, English testified that the problem "is five times as worse today than it ever was. We have got a guy on the corner of Carlisle and Oxford that thinks nothing of dropping twenty five or thirty wrecks right in the middle of the street . . . "
   Q. And this of course has antagonized you, hasn't it?
   A. This puts the entire street out of business, everybody.
   Q. But has it antagonized you?
   A. Yes.
We have little doubt that the actions of the anonymous repairman angered the Englishes, but there is not the slightest indication in the record that English in any way associated this scofflaw with petitioner who had left the block some 17 years before. In fact the record indicates, and we find, to the contrary: (R. 28)
   BY THE COURT (to Frank English, the brother of the juror in question):
   Q. Did your brother ever evince any hostility toward the class of persons of which Mr. Taylor was a group, namely, the class of four or five body-shop owners?
   A. No, sir.

6. The conversation dealt with an unrelated business matter involving the adjustment of an insurance claim arising out of a casualty loss at Taylor's place of business.

ing the latter.[7] However, both John and Frank English emphatically denied making such a statement.[8] Though John English did not impress us as the most temperate of persons, neither did he impress us as devious or dishonest and we were strongly impressed with the demeanor of his brother, Frank. We are faced with petitioner's allegation of an hearsay statement, denied both by the alleged original declarant and by the one who supposedly repeated it. We credit the testimony of both John and Frank English that the alleged offending statement was not made by English to Frank English nor by Frank English to Taylor. While we do not doubt that Frank English and Taylor did in fact have a conversation in which it was mentioned that English was on Taylor's jury, we believe that Taylor's version of the conversation is essentially a function of his characterization of the effect of the jury verdict (*i. e.*, it "screwed" him) in which John English played a one-twelfth role. We thus find no reason to alter our earlier finding that English harbored no bias toward petitioner at the time of trial.

## B. *Ineffective Assistance of Counsel*

Taylor was represented at trial by David N. Savitt, Esq., a member of the Bar for fourteen years at the time of trial.[9] Judge Savitt testified at the hearing that at the time of trial and for approximately the ten years preceding trial, his practice consisted of approximately 80% criminal defense work. During this time he had handled between eight and ten criminal matters as far as the Pennsylvania Supreme Court and had tried numerous cases to juries in both the federal and state courts. Included in the federal trials were at least two bank-robbery cases and in the state proceedings approximately twenty homicide cases. There can be no doubt that Judge Savitt was an able and qualified attorney, fully capable of representing petitioner and we so find.

The facts forming the claim of ineffective assistance of counsel relate solely to the selection of the jury at Taylor's trial. We are confronted with several different versions of what transpired during voir dire and it is our task to determine what actually happened.

English testified that during voir dire potential jurors were asked, en masse, whether anyone knew the defendant.[10] English testified that he stood up, said that he knew Taylor and sat back down. He further testified that no one followed

7. (R. 114) (cross examination of petitioner):
Q. Now, did [Frank] English say that you were screwed or did [Frank] English say that John English told him that you were screwed?
A. John English told him that he screwed me.
Q. So John English said that?
A. He said, "my brother said he screwed you, Joe."
And later in response to an inquiry of the Court, petitioner's response was as follows: (R. 114)
A. No. This is what he said to me, sir. He said, my brother said he f—— you. That is the exact word he said to me.

8. (R. 21) (Frank English—direct):
A. Well, I doubt very much I would have said that to Mr. Taylor for this reason: I know absolutely nothing about the case to this day. Right now I don't know anything about the case. So I doubt very much if I can comment to anybody on something I know nothing about.

John English's testimony, as noted in the text, though more disjointed, finally produced this response (R. 47–48):
Q. I understand that you do not say that you ever said that about that you screwed Joe Taylor. Is it your testimony that you deny ever having said it or that you don't remember whether you said it or not or that you may have said it but, if so, you don't remember? What is your testimony? Because that is certainly important to me.
A. I deny saying that the panel screwed Joe Taylor, putting it bluntly.

9. In November 1973 Mr. Savitt was elected a judge of the Common Pleas Court of Philadelphia, which position he continues to hold.

10. Petitioner's trial was presided over by the late Judge Ralph C. Body. It is uncontested that Judge Body—after receiving a written waiver signed by Judge Savitt, Taylor and the Assistant United States Attorney prosecuting the case—excused himself from the bench during the voir dire here discussed.

up on this by asking him how he knew Taylor. To the best of his recollection, this was all that occurred at voir dire concerning his prior acquaintance with petitioner.

English's testimony is essentially corroborated by the transcript of the voir dire:

MR. McBRIDE (Assistant United States Attorney):

Preliminarily I would like to ask if any of you are familiar with Mr. Taylor. Do you know him? Do you know anything about the facts of this case? Have you read anything about it in the newspapers? It took place allegedly back at the end of 1967 and 1968. Have any of you any knowledge regarding the facts of this case,

Identify yourself, please.

MR. ENGLISH: No. 13. What is Mr. Taylor's address?

TAYLOR: 1210 West College Avenue.

MR. SAVITT: 1210 West College Avenue, Philadelphia.

MR. ENGLISH: I believe I recognize the gentleman.

MR. McBRIDE: All right, you are Mr. English?

MR. ENGLISH: Yes, sir.

MR. MCBRIDE: Thank you, sir. Anyone else?

The transcript indicates no further questioning of Mr. English by either the Assistant United States Attorney or defense counsel at any time during voir dire. Yet another version of what occurred was presented by Taylor in his testimony at the hearing:

BY THE COURT: Now did [Mr. McBride] ask the jurors whether any of them knew you or recognized you?

A. Yes, he did.

Q. And did any juror respond to that question?

A. I thought English did stand up, Your Honor, and said that he thought he knew me.

Q. And did anybody ask him any further questions?

A. The prosecutor, I think, asked me to stand up. And when I stood up, English said I wasn't the guy. He asked me where I live and he said I wasn't the guy. I told him where I live and he said I wasn't the guy.

Q. Where did you say you lived?

A. I live on Grange Street.

Q. That is where you lived then?

A. Yes.

Q. Well that is up in Olney or West Oak Lane, isn't it?

A. Yes.

Q. Was anything further said by the lawyers? Did the lawyers seek to ask him any more questions?

A. No, not to my recollection.

Q. Did you recognize English at that time?

A. No, sir.

Q. You are saying that he stood up and said that—that English stood up and said you weren't the guy?

A. Yes. The prosecutor asked did anybody know the defendant. The prosecutor said, "will the defendant stand up?" I stood up. He said I wasn't the guy. And what transpired after that I really don't remember.

Q. Was anything said or asked about whether you ever had a place of business on Carlisle Street or what business you were in?

A. No, sir.

Taylor also called one P. C. Crump to the stand who testified that he was a friend of Taylor's and had attended each day of the trial. Mr. Crump, however, disputed Taylor's version of what occurred and in fact corroborated English's testimony as to what had happened.

Taylor's testimony clearly conflicts not only with that of Messrs. English and Crump but also with the official transcript. We do not view this as an instance where the Court Reporter could have inadvertently missed something said by the prospective juror. To the contrary, to credit Taylor's recollection

of the event we would have to find that the reporter recorded "I believe I recognize the gentlemen" upon hearing "that's not the guy." The probability of such an error would be small even if there were no other testimony.[11] Here both the testimony of Crump and English support the transcript and we accordingly credit that version of the events at voir dire and disregard Taylor's.[12]

During the second day of our hearing, Taylor was recalled to the witness stand and was questioned as to what conversation, if any, took place between his attorney and himself immediately after English indicated recognition. At first, Taylor testified that he did not speak with his attorney nor did his attorney talk with him when English made his statement. He then altered his position and testified that "I can't remember discussing the juror with Mr. Savitt, to be truthful about it." On cross-examination Taylor again changed his story and asserted that "he [Mr. Savitt] probably asked me if I recognized the man. I tell him I didn't know the man." We think it clear from these portions of the testimony that petitioner does not recall what occurred after Mr. English stood up and we so find.

We also have no difficulty in finding that Judge Savitt, though able to testify that his customary practice would be to discuss such a development immediately with his client, is honestly incapable of recalling whether he did so in this particular instance at this particular trial. Though both Judge Savitt and Taylor do not so recall, Mr. Crump, who was called by Taylor, testified that he recalled that conversation did in fact take place between Judge Savitt and Taylor immedi-

ately following English's statement (R. 199–200):

BY MR. McGETTIGAN [Assistant United States Attorney]:

Q. But during the voir dire of the jury you were at such a point in the courtroom you could see where Mr. English stood up and indicated recognition?

A. Yes.

Q. Did you hear him say it?

A. Yes.

Q. But your vantage point wasn't such to know whether or not Mr. Savitt and Mr. Taylor had any conversation pursuant to that?

A. I don't know what Mr. Taylor and Mr. Savitt said at his table. But what was said by Mr. English was in open court.

BY THE COURT:

Q. Could you see whether Mr. Savitt and Mr. Taylor were talking?

A. Could I see where they were talking?

Q. Whether they were talking?

A. There was conversation going on between them. Now, what it was about, I cannot say.

Q. Was there conversation going on between them immediately after English stood up?

A. Yes. There was conversation going on after he was seated and before he was—before he stood up, too, there was conversation. There was conversation between them all the time.

We found Mr. Crump to be a credible witness with little interest in the outcome.[13] We find, on the basis of his testimony that Taylor and Judge Savitt did discuss the situation when confront-

11. The Court Reporter, Lewis Dunbar, was summoned to the courtroom during the hearing but had no independent recollection of what had transpired, nor did Judge Body's then courtroom deputy clerk, Daniel Spitz.

12. The only discrepancy between the testimony of Crump, English and the transcript relates to whether English had asked for peti-

tioner's address before making his tentative identification. The discrepancy is minor and readily explainable in view of a 2½ year lapse.

13. Being a friend of petitioner, we may assume if he had any interest in the proceeding at all, it would favor petitioner.

ed with English's statement.[14] We, of course, are incapable of determining what was said during that discussion to a certainty. However, we think that we may and hence we do infer that the conference concerned Mr. English's indication of recognition and that pursuant to that conversation a tactical decision was made not to question English any further. By way of further explication, we believe there to be only two reasonable explanations for Savitt's failure to pursue the matter. The first is that Taylor recognized English and informed Savitt that he was someone who would favor him and hence should be left on the jury. In such instance, Savitt would naturally have eschewed further questions. The second is that Taylor informed Savitt that he did not know English (it having been about fourteen years since they had last met) and that Judge Savitt accordingly decided not to pursue the matter for fear of antagonizing English or the other jurors. In addition, Savitt may have assumed that in view of Taylor's non-recollection, any relationship between Taylor and English was either inconsequential, thus making further questioning unwarranted, or friendly, in which case he certainly would make no effort to investigate.

While the foregoing represents less than the conventional factual finding, we note that despite our earnest attempts to flesh out a meager record, we are faced with the fact that neither petitioner nor his attorney recall what went on during that conversation. Being left with a record indicating a statement of recognition by a prospective juror of the defendant and a conversation between defendant and his lawyer immediately following such identification pursuant to which nothing further is done, we believe that it is proper that we infer

what in fact happened or may have happened.

Taylor testified that sometime during the later stages of the trial, still not realizing who English was, he asked Judge Savitt for permission to talk to English to find out who he in fact was. Whatever Taylor's knowledge at the time, Judge Savitt (correctly) advised petitioner that he was not permitted to speak with a juror at any time and Taylor promptly dropped the matter.

## III. *Discussion*

### A. *Impartial Jury*

The Sixth Amendment provides that defendants charged with crimes in federal courts "shall enjoy the right to . . . trial, by an impartial jury." But, as the Court noted in United States v. Wood, 299 U.S. 123, 145–146, 57 S.Ct. 177, 185, 81 L.Ed. 78 (1936), "[i]mpartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula." Nevertheless, courts have on occasion grappled with the problem of the biased juror and have granted appropriate relief when the situation so required.[15]

In examining claims of partiality on the part of a juror, courts have reversed convictions and provided a new trial in only two types of situations. First, if on voir dire, during trial or on post-trial motions, it becomes apparent that the challenged juror possessed at the time of trial a so-called "actual bias" that influenced his judgment of the case, any conviction will be reversed. In addition, there are those instances in which (in the words of Chief Justice

---

14. Although we rest our finding that Taylor discussed the matter with counsel on the uncontradicted testimony of Mr. Crump, we add that we think we are entitled to give some weight to Judge Savitt's testimony as to his "standard operating procedure" in such a situation. That would be, of course,

to discuss the incident with his client before deciding what course to follow.

15. *See, e. g.*, United States ex rel Fletcher v. Cavell, 287 F.2d 792 (3d Cir.) cert. denied 366 U.S. 944, 81 S.Ct. 1672, 6 L.Ed.2d 855 (1961).

Marshall) a person "may declare that he feels no prejudice in the case; and yet the law cautiously incapacitates him from serving on the jury because it suspects prejudice because in general persons in a similar situation would feel prejudice." 25 Fed.Cas. at 50, 1 Burr's Trial 414. We will examine both the actual and implied bias theories to see if either is applicable to the case before us.

### 1. *Actual Bias*

■ We were convinced at the hearing of this matter and therefore found that English possessed no bias toward petitioner at the time of trial. The incidents complained of between English and Taylor had occurred some 14 years before trial. There was no indication in the record supporting Taylor's claims that English took out on Taylor a grudge harbored against those alleged wreck dumpers who followed him to Carlisle Street. Moreover, when the panel was asked whether anyone recognized Taylor, English responded openly that he "believed that he did." Though the mass voir dire afforded an excellent opportunity for one who wished to hide his acquaintance with Taylor, English stepped forward and candidly indicated recognition. We would expect just the opposite reaction from one devious or spiteful enough to violate a juror's oath for vendetta's sake.

We found, in addition, that at no time did English mention his earlier contacts with Taylor to any other members of the jury.[16] In sum we hold that petitioner has failed to "raise a contention of bias from the realm of speculation to the realm of fact." Dennis v. United States, 339 U.S. 162, 168, 70 S.Ct. 519, 521, 94 L.Ed. 734 (1950).

In addition, we note that even if we had found that English had related to

his brother that he had "screwed" Taylor, we would still have difficulty in finding actual bias. While there are a colorful variety of usages for the verb "to screw", we think its alleged use in this situation by English could well have represented no more than his crude means of best describing to his brother the results of the trial. In other words, English might well describe any defendant convicted even in a scrupulously fair trial as being "screwed."

We find petitioner's reliance on United States ex rel. Fletcher v. Cavell, *supra*, inapposite. In *Fletcher* appellant had been convicted of murder by a jury which had before it rather incriminating evidence in the form of testimony by a Greene County (Pennsylvania) detective. Despite learning of the problem before jury selection was complete, the trial judge allowed one Paul E. Stephenson to sit as a member of the jury even though Stephenson was the son-in-law of the testifying detective. At the hearing on Fletcher's petition for a writ of habeas corpus, Stephenson testified that he believed the testimony of his father-in-law because the testimony was given by his father-in-law. Judge McLaughlin noted for the Court of Appeals:

> In the face of his frankly stated attitude toward his father-in-law's evidence which pointed to Fletcher as having been at the crime scene within the critical time, it was impossible for him to believe Fletcher's alibi defense. . . . It follows that Stephenson, sitting on that jury as its foreman, was *actually biased* in favor of the prosecution evidence of "paramount importance" given by [his father-in-law.]

(emphasis supplied) 287 F.2d at 797. Thus *Fletcher* dealt with the actual bias

---

16. *Cf.*, United States ex rel. Johnson v. Yeager, 327 F.2d 320 (3d Cir.) cert. denied 377 U.S. 984, 84 S.Ct. 1890, 12 L.Ed.2d 751 (1964), stressing the importance of this point where a juror sitting on a robbery-murder case was married to one victimized in such an incident about ten years earlier.

In that case the juror was dismissed from service due to illness before the case went to the jury and the court in denying a petition for writ of habeas corpus stressed the fact that the jury never was exposed to the alleged prejudicial information.

of a juror, a situation we have found did not exist during petitioner's trial.[17]

### 2. Implied Bias

"At common law, jurors were challengeable on principle for bias or partiality due to kinship, interest, former jury service in the same cause, or because the prospective juror was a master, servant, counsellor, steward or attorney, or of the same society or corporation." Casias v. United States, 315 F.2d 614, 620 (10th Cir.) cert. denied 374 U.S. 845, 83 S.Ct. 1901, 10 L.Ed.2d 1065 (1963). As noted earlier, the purpose of such disqualification was to recognize that there are those situations in which the average man cannot be expected to be impartial despite his protestations to the contrary.[18] Modern courts have added only sparingly to the list of common law exclusions.

■ Taylor contends that his earlier meetings with English were sufficient to create a presumption that an average man having experienced the same incidents would not have been able to provide him a fair trial. We disagree. Though we are well aware of the necessity of providing a fair and unbiased jury, we also must consider that "[i]f the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain

jury trial under the conditions of the present day." Holt v. United States, 218 U.S. 245, 251, 31 S.Ct. 2, 6, 54 L.Ed. 1021 (1910). Indeed, in some of the more sparsely populated regions of our country there can be little doubt that jurors sit regularly in judgment of neighbors or acquaintances whom they have known for years. To hold that an implied bias exists in such a situation would impair the sovereign's ability to provide any jury trial at all in such regions.[19] In other words, we conclude that the mere fact that a potential juror has argued with a defendant some fourteen years earlier is insufficient ground for us to conclude that he is incapable of rendering a fair verdict in the matter presently before him.

We find Taylor's reliance on United States ex rel DeVita v. McCorkle, 248 F.2d 1 (3d Cir.), cert. denied 355 U.S. 873, 78 S.Ct. 121, 2 L.Ed.2d 77 (1957) misplaced for several reasons. In *DeVita* the jury had before it a defendant accused of robbery and murder. As defendant's participation was essentially admitted, the jury's sole function was to determine whether life imprisonment or execution was the appropriate penalty. One of the jurors who sat on that trial had been the victim of a similar armed robbery just seven months before the one in question at trial, and only several blocks away from the one in question.

17. *Compare* Fletcher *with* United States ex rel. Luzzi v. Banmiller, 248 F.2d 303 (3d Cir. 1957), cert. denied 355 U.S. 924, 78 S. Ct. 367, 2 L.Ed.2d 355 (1958) relying in part on the trial court's finding of no actual bias as a basis for denying petitioner relief. And *cf.* United States v. Whitaker, 372 F. Supp. 154 (M.D.Pa.1974), where the Court satisfied itself that a challenged juror had rendered his verdict without prejudice and without considering any facts not in evidence and thus refused to overturn a verdict even assuming that the juror knew certain facts that he should have revealed on voir dire.

18. *See, e. g.,* Virgin Islands v. Bodle, 427 F. 2d 532 (3d Cir. 1970) reversing (as an exercise of the Court of Appeals supervisory powers and not on Constitutional grounds) the conviction of defendant for forcible rape, where a female jury member's sister had been subjected to a similar attack some six

years earlier. And *cf.* United States v. Poole, 450 F.2d 1084 (3d Cir. 1971) where the Court found of "some significance" a contention that in the context of a criminal trial for bank robbery it was error to refuse to excuse for cause veniremen employed as bank tellers. (The Court reversed the conviction on other grounds.)

19. *Cf.* Virgin Islands v. Williams, 476 F.2d 771, 774 (3d Cir. 1973) where Judge Maris discusses the problem posed in the Virgin Islands where jurors hear and pass on the credibility of the same government agents testifying for the Territory in several different narcotics prosecutions, often at the same term of court. And *cf.* United States v. Haynes, 398 F.2d 980, 986 n. 3 (2d Cir. 1968), cert. denied 393 U.S. 1120, 89 S.Ct. 996, 22 L.Ed.2d 124 (1969) discussing the same problem in the context of rural upstate New York juries.

In addition to being a recent victim of an almost identical crime, the juror's incident was investigated by the same division of the Newark police force that subsequently investigated the case on which the juror sat. Finally, the juror —in fear of his life—had been regularly escorted by a member of the police to his bank at all times following his hold-up. Clearly the court was faced with a situation in which no person having so recently been subjected to such experiences could be expected to sit impartially. The fact that the juror was permitted to sit was held grounds for a new trial. We can see not the slightest resemblance between the factual situation facing the Court in *DeVita* and that now before us. The possibility of prejudice in *DeVita* was so strong as to make it clear that the only reasonable course was to presume that it did exist.[20] We simply do not find that to be the case here.[21]

Our second reason for distinguishing *DeVita* is hinted at in that opinion and spelled out in Rosania v. New Jersey, 299 F.2d 101 (3d Cir.), cert. denied 371 U.S. 893, 83 S.Ct. 192, 9 L.Ed.2d 126 (1962). In *DeVita*, Judge McLaughlin noted:

> The assurance of an impartial tribunal is too vital to be subjected to speculation concerning the quantum of prejudice flowing from this grossly disqualified juror. . . . This principle was especially applicable to trial of appellant and his co-defendants the design of which was to have the jury pass on the *essentially judicial question of sentence, life or death,* instead of the jury fact finding and determination of guilt or innocence. *For that kind of trial* the Fourteenth Amendment insists on the most impartial tribunal the reasonable needs of society will permit.

(emphasis supplied) 248 F.2d at 8. That quotation would seem to indicate that even the egregious circumstances surrounding the juror in question were sufficient only to disqualify him from passing on the question of sentence and not from a determination of guilt or innocence. The Third Circuit so held in *Rosania* in which a sentence of life imprisonment given a co-defendant tried with DeVita by the same jury was upheld. Said the Court:

> In DeVita, we held that only those proceedings involving the juror's deliberations on whether or not to recommend life imprisonment were vitiated and not the entire trial. There was no holding of fundamental unfairness.

299 F.2d at 102. As is the case in all federal trials, petitioner in the case at bar was sentenced by the trial judge and the jury was called upon only to determine the question of guilt or innocence. Thus we find *DeVita* unpersuasive as grounds for vacating Taylor's conviction.[22]

---

20. Although we read *DeVita* as an implied bias case since there was never elicited from the challenged juror any admission of prejudice, we note that at least one decision of this Circuit (United States v. Poole, 450 F. 2d 1082 (3d Cir. 1971)) has found that the combination in *DeVita* of the previous robbery incident *and* the juror's purposeful concealment of it was sufficient to make the case one of actual bias:

> The obvious conclusion is that an individual whose desire to be a juror is so great as to cause him to conceal relevant information on voir dire must certainly be incapable of objectivity. *DeVita* then is a case involving actual and demonstrated bias.

450 F.2d at 1083. Regardless of whether *DeVita* is characterized as an instance of actual or implied bias, it is obvious that our Court of Appeals was greatly disturbed by the juror's failure to reveal the relevant information. But in the case before us, English candidly revealed his acquaintance with Taylor, an action which as we previously noted, is hardly an indication of a biased juror.

21. We believe Brown v. United States, 356 F.2d 230 (10th Cir. 1966) stands for essentially the same proposition. The Court there found itself unwilling to imply prejudice where none had been proved.

22. We note, however, that the Third Circuit did rely on *DeVita* as grounds for overturning a guilt determination in Virgin Islands v. Bodle, *supra*, n. 18, and thus may be said to

**B.** *Ineffective Assistance of Counsel*

The standard to be applied in determining the question of ineffective assistance of counsel is the so-called "normal competency" test. That standard was first enunciated in this Circuit in Moore v. United States, 432 F.2d 730 (3d Cir. 1970) and has been the law of this Circuit since:

. . . [T]herefore the standard of adequacy of legal services as in other professions is the exercise of the customary skill and knowledge which normally prevails at the time and place.

A retrospective examination of a lawyer's representation to determine whether it was free from any error would exact a higher measure of competency than the prevailing standard. Perfection is hardly attainable and certainly is not the general rule, especially in professional work where intuitive judgments and spontaneous decisions are often required in varying circumstances.

.    .    .    .    .    .

The standard of normal competency applies. . . . This standard also makes it clear that the ultimate issue is not whether a defendant was prejudiced by his counsel's act or omission, but whether counsel's performance was at the level of normal competency. 432 F.2d at 736–737.

■ We believe that Judge Savitt more than adequately met such a standard in his defense of petitioner. We have found that upon hearing English's identification, Judge Savitt immediately consulted with his client. Only after doing so was the course of remaining silent apparently chosen. Taylor, in his brief, cites us to the American Bar Association Minimum Standards relating to Defense Function. § 5.2(b):

The decisions on what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions should be made, and all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with his client.

However, we have found that this is precisely the course which Judge Savitt followed. What occurred in that conversation no one remembers and we are incapable of divining. Had Taylor convinced us that he made Judge Savitt aware of his problems with Mr. English and had Judge Savitt still refused to do anything we might have reached a different conclusion. But the "burden is on [petitioner] to demonstrate that his counsel gave him inadequate representation" and that Taylor has failed to do.[23]

Moreover, were we to have credited Taylor's version of the facts, we would have been obliged to reach precisely the same result. For, according to Taylor, after the purported recognition the prosecutor asked Taylor to stand up whereupon English is said to have remarked that he [Taylor] "wasn't the guy." In that event, even if there had been no conversation between Savitt and Taylor, there would have been no earthly reason for Savitt to have pursued the matter further.

■ Finally, we would be remiss if we did not advert at some point to Judge Body's comments in the sentencing record directed to Judge Savitt:

I thought you did an outstanding job . . . I think you did a tremendous job in the trial of this case, but

have tacitly overruled *Rosania.* In *Bodle* the Court did point out that it found no situation of fundamental unfairness or denial of Sixth Amendment rights but reversed instead as an exercise of its "broad powers of supervision over the administration of criminal justice in the Federal courts." 427 F.2d at 534. Even if Rosania has been overruled we would still find *DeVita* unpersuasive authority for the reasons discussed in the text accompanying notes 20 and 21.

23. United States v. Varga, 449 F.2d 1280, 1281 (3d Cir. 1971) ; *See* United States v. Hines, 470 F.2d 225, 231 (3d Cir. 1972) cert. denied 410 U.S. 968, 93 S.Ct. 1452, 35 L.Ed.2d 703 (1973).

the facts against you as presented by the District Attorney [sic] and the F.B.I. and the witnesses was just overwhelming, absolutely overwhelming.

As noted in *Moore*, lawyers are not perfect. We think Judge Body's remarks shed a good deal of light on the question of whether Judge Savitt's performance was within the range of "normal competency." We find no ineffective assistance of counsel here.[24]

## C. *Absence of the Judge from the Bench During Voir Dire.*

The record reveals that prior to the voir dire, Mr. McBride (counsel for the Government), Judge Savitt (counsel for the defense), and the defendant Taylor all executed a document waiving the presence of the trial judge at the voir dire. That document provided:

I do hereby waive the right to have the jury selected in this criminal proceeding in the presence of a member of this Court. I make this waiver with full and complete understanding of my right to have the jury selected in the presence of the judge.

I do further understand that should any serious dispute or disagreement arise during the selection process that the judge is available to rule on the matter.

I am further aware that the proceedings involved in the selection of the jury will be transcribed in the presence of an authorized court stenographer and counsel.

I do further certify that I am satisfied and agreeable to the procedure applied to the selection of the jury. Pursuant thereto, Judge Body absented himself from the bench during the voir dire and remained, instead, in chambers.

Taylor argues that Stirone v. United States, 341 F.2d 253 (3d Cir.) cert. denied 381 U.S. 902, 85 S.Ct. 1446, 14 L. Ed.2d 284 (1965), requires reversal of his conviction under these circumstances. In *Stirone* the trial judge absented himself from the bench with the consent of all counsel during counsel's exercise of their peremptory challenges. The Court of Appeals refused to reverse petitioner's conviction, relying on the lack of any showing of prejudice to petitioner and on what it found to be an acceptable waiver of the trial judge's presence made by counsel, noting:

Even if there had been no waiver of the judge's presence during the peremptory challenges that would be no ground for relief in a § 2255 proceeding. The mere absence of the judge for a short time, without a showing or allegation of prejudice is not reversible on direct appeal itself. Heflin v. United States, 125 F.2d 700 (5th Cir. 1942), cert. denied 316 U.S. 687, 62 S.Ct. 1276, 86 L.Ed. 1759 (1942). It follows that in this collateral proceeding that type of absence is of no substance. 341 F.2d at 256 n. 3.

However, the Court added to the footnote just cited the following admonition:

In fairness to the trial judges of this circuit, hereafter in criminal cases, irrespective of suggestion of waiver by the parties, trial judges will not leave the bench during any part of the voir dire or other jury selection process without recessing the court.

The concluding language of that footnote is the basis for Taylor's final claim for relief herein.

The language of the *Stirone* footnote makes clear that the court was not announcing a constitutional rule.[25]

24. We also hold that counsel was well within the limits of normal competency when late in the trial he instructed petitioner not to speak with any member of the jury. At that time Taylor had given counsel no indication that something was amiss and therefore Judge Savitt's actions were entirely proper.

25. We agree with Judge Wood's statement in the District Court in Haith v. United States, 231 F.Supp. 495, 498 (E.D.Pa.1964) aff'd 342 F.2d 158 (3d Cir. 1965):
There is no constitutional right to any particular manner of conducting the voir dire and selecting a jury so long as "such limi-

While it did not articulate it as such, we assume that the *Stirone* court was purporting to announce a rule having roots in the "supervisory powers" of the Court of Appeals over the conduct of trial judges within the Circuit.[26] Though in view of the *Stirone* rule it appears that Judge Body should not have excused himself from the proceedings, we feel this departure from the norm is insufficient, given the circumstances of this case, to warrant the granting of relief. This conclusion follows from our conviction that *Stirone* was not intended to lay down a *per se* rule requiring reversal whenever violation is proven, but rather a prophylactic procedure the violation of which would warrant the relief of a new trial only upon a showing of prejudice to the defendant. Thus, before relief can be granted, Taylor must prove not only prejudice, but also that it was the absence of Judge Body from the bench that was the cause of any prejudice that he might have suffered.

tations as are recognized by the settled principles of criminal law to be essential in securing impartial juries" are not transgressed. Pointer v. United States, 151 U.S. 396, 407–408, 14 S.Ct. 410, 38 L. Ed. 208 (1894).

**26.** There is controversy as to the nature and scope of the "supervisory power" of the Court of Appeals. The statutory scheme establishing the United States Courts and providing for their organization and administration makes no such provision. However, the decision of the Supreme Court in Bartone v. United States, 375 U.S. 52, 84 S.Ct. 21, 11 L.Ed.2d 11 (1963), refers to the "broad powers of supervision" which both the Supreme Court and the Court of Appeals have over proceedings in the federal courts. Interestingly, while that case cites McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943) as authority for the Supreme Court's supervisory power, the opinion provides no reference to the source of the Court of Appeals' power. It is, of course, possible for the Supreme Court properly to delegate the supervisory function granted it by Congress to the Courts of Appeals, but it can be argued that were it to so act, it should do so in a somewhat more formal fashion than its one sentence remark in the three page *per curiam* opinion in *Bartone.*

Our Court of Appeals has frequently exercised the supervisory power, citing *McNabb, Bartone* and its own cases in which it has previously exercised the power (relying in turn on *McNabb* and *Bartone.*) *See, e. g.,* In re Schofield, 486 F.2d 85 (3d Cir. 1973) (requiring preliminary showing of relevancy to the investigation by the government before witness disobeying grand jury subpoena may be held in contempt); United States v. Schiavo, 504 F.2d 1 (3d Cir. 1974) (requiring district courts to follow certain procedural steps before entering silence orders controlling the press during criminal trials); Virgin Islands v. Bodle, 427 F.2d 532 (3d Cir. 1970) (reversing conviction for rape where juror's sister was previous rape victim). However in a vigorous dissent in the *Schiavo* case, Judge Aldisert, with whom Judge Weis concurred, stated:

Under the aegis of the exercise of the court's supervisory power the plurality retroactively enunciates a new rule of procedure requiring that a silence order vindicating a criminal defendant's Sixth Amendment rights, if it refers to non-parties, must (a) be reduced to writing, (b) state specifically the terms of the order and the reasons therefor, and (c) be entered on the district court docket.

But this court has no power to prescribe procedural rules for the governance of the district courts. That power is vested, by statute, in the Supreme Court. 18 U.S.C. §§ 3771, 3772; 28 U.S.C. §§ 2072, 2075. At the very most, the suggestions of the plurality should have been directed to the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States, 28 U.S.C. § 331, instead of incorporating them by judicial fiat in an in banc opinion. (footnote omitted).

Judge Adams in his concurring opinion referred to the Court's "purported" supervisory powers but did not reach that issue. We trust that in cases to come, the Court of Appeals will clarify the issues raised in Judge Aldisert's dissent and restate or synthesize its view as to the nature and scope of the supervisory power and the proper means of exercising it.

For the purposes of this opinion, we will assume the existence of the supervisory power and that the power need not be exercised by a formal rulemaking procedure, *cf.* The Case for an Open Judicial System, 58 J.Am.Jud.Soc'y 61, 67, or by the Court *en banc,* but rather that it may be properly exercised by a panel of the Court of Appeals in a footnote to an opinion. As we have already noted in the text, we have assumed that it was the supervisory power that the Court of Appeals was exercising in *Stirone.*

For the reasons discussed in detail in the preceding portions of this opinion, we have found that Taylor was convicted by a fair and impartial jury which included Mr. English. Because a showing of prejudice is essential if relief is to be granted on the basis of *Stirone*, it follows that Taylor is entitled to none. Moreover, we cannot say that had Judge Body remained on the bench during voir dire, events would have transpired any differently. Indeed, if Judge Body had been observing the proceedings carefully, we think it likely that after seeing Judge Savitt consult with Taylor and proceed no further, he would have found it highly inappropriate to pursue the matter. We say this because it is our belief that a trial judge should not interfere with the strategic decisions of counsel made after consultation with his client.

As in the claim of ineffective assistance of counsel, we might have reached a different result if it had been shown that counsel and client had not conferred after English's identification. In such a situation it might have been incumbent upon the trial judge to investigate the matter further. But, as we have said, where counsel is aware of the remarks, consults with his client and thereafter elects to do nothing about it, we see no reason for the trial judge to intervene. Hence, we find no causal relationship between Judge Body's absence from the bench and any prejudice allegedly suffered. We conclude that Taylor is not entitled to relief on the ground that Judge Body was not present during voir dire. *Cf. Stirone, supra,* also refusing to overturn defendant's conviction without a showing of prejudice and Haith v. United States, 342 F.2d 158 (3d Cir. 1965) which reaches the same result on identical grounds.[27] We annotate this conclusion with two additional observations. First, the waiver of Judge Body's presence during voir dire was signed by Taylor and his counsel. Second, the waiver, which is part of the

record, was not contested during trial, on post-trial motions, in the direct appeal to the Court of Appeals nor in the § 2255 petition filed before this Court; indeed, it was not brought to our attention until after our hearing in this matter, by way of a letter brief filed by Taylor.

While the foregoing discussion explains the basis for our decision on the final point raised by Taylor, we feel constrained to add thereto the thought that the Court of Appeals might wish to reconsider the *Stirone* doctrine *in toto,* but in any event, at least to the extent that it requires the judge, even after receiving a knowing and intelligent waiver, to remain present during the exercise of peremptory challenges. We note that the Constitution permits far more substantial rights to be waived, *e. g.,* the right to counsel or to a jury trial. We recognize the qualitative difference between the waiver of such rights and the "right" to have the trial judge present because of the trial judge's functions of protecting the rights of all parties and ensuring a fair trial. However, balancing the historical lack of apparent problems when the trial judge absents himself during peremptory challenges with the considerable demands on federal trial judges in chambers as well as in court, it would seem that the scales would strongly tip toward permitting the judge to absent himself from the bench, at least during the peremptory challenge phase, which often consumes much time in this district. Chambers time is much needed and the judge could put it to good use while nonetheless remaining nearby the courtroom in case difficulties arise. We thus believe reconsideration of the *Stirone* footnote to be worthy of the Court of Appeals' attention.

### III. *Conclusion*

For the reasons set forth in the foregoing opinion, we must deny petitioner Taylor relief.

---

27. We think the government's reliance on *Haith, supra,* for the proposition that the *Stirone* standard is dispensable misplaced since the trial in *Haith* took place prior to the *Stirone* decision.